**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ONEIDA GROUP INC. <br><br> Plaintiff, <br><br> - against - <br><br> STEELITE INTERNATIONAL U.S.A. INC., TABLEWERKS, INC., RICHARD ERWIN, STEVEN LEFKOWITZ, and ANTHONY DELOSREYES <br><br> Defendants. | Civil Action No.: 2:17-cv-00957 (ADS) (AKT) |

**PLAINTIFF'S RESPONSE TO DEFENDANT STEELITE
INTERNATIONAL'S OBJECTIONS (DE 50) TO THE REPORT
AND RECOMMENDATION OF MARCH 14, 2017**

# TABLE OF CONTENTS

**Page**

A.   The R&R Correctly Concluded that Oneida Will Suffer Irreparable Harm if
     Steelite Is Permitted to Sell SANT' ANDREA® Products from Royal
     Porcelain ................................................................................................ 1

B.   The R&R Correctly Found That Oneida Owns Protectable Trade Dress in Its
     Tableware Designs .................................................................................. 2

     1.   Oneida was the first to use its trade dress in commerce ............................ 2

     2.   Oneida owns the trade dress in its SANT' ANDREA® products .............. 3

C.   The R&R Correctly Found That Oneida's Trade Dress in Its Tableware
     Designs Has Acquired Secondary Meaning ............................................ 7

D.   The R&R Correctly Found a Likelihood of Confusion Between Oneida's
     SANT' ANDREA® Products and Steelite's Exact Copies .................................. 9

E.   The R&R Correctly Determines that the Balance of Hardships Weighs in
     Favor of Oneida ...................................................................................... 10

F.   Oneida Is Entitled to an Injunction ....................................................... 11

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin*,
    754 F.2d 1015 (2d Cir. 1985) .................................................................14

*AIM Int'l Trading LLC v. Valcucine SpA.*,
    188 F. Supp. 2d 384 (S.D.N.Y. 2002) ....................................................15

*Alcatel Space, S.A. v. Loral Space & Commcn's Ltd.*,
    154 F. Supp. 2d 570 (S.D.N.Y. 2001) ...............................................12, 14

*Avakoff v. S. Pac. Co.*,
    765 F.2d 1097 (Fed. Cir. 1985) ................................................................2

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
    No. 15-CV-1992, 2015 WL 845711 (S.D.N.Y. Feb. 26, 2015) .............3, 6, 10, 11

*Eastman Kodak Co. v. Collins Ink Corp.*,
    821 F. Supp. 2d 582 (W.D.N.Y. 2011) ...................................................15

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
    808 F. Supp. 952 (E.D.N.Y. 1992) ...........................................................5

*Fisher v. O'Brien*,
    No. 09-CV-42, 2010 WL 1286365 (E.D.N.Y. Mar. 30, 2010) ..............6, 9

*Givenchy S.A. v. William Stuart Indus.*,
    No. 85 CIV. 9911 (PKL), 1986 WL 3358 (S.D.N.Y. Mar. 10, 1986) ....15

*Great Am. Ins. Co. v. Gross*,
    No. 3:05CV159, 2005 U.S. Dist. LEXIS 8003 (E.D. Va. May 3, 2005) ..........12, 13

*Johnson v. Kay*,
    860 F.2d 529 (2d Cir. 1988) ...................................................................12

*Nordic Windpower USA, Inc. v. Jacksonville Energy Park*,
    LLC, No. 5-12-cv-12, 2012 U.S. Dist. LEXIS 55552 (D. Vt. Apr. 18, 2012) ........12, 13

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990) ...................................................................14

*Riley v. Rivers*,
    No. 15-CV-5022, 2017 U.S. Dist. LEXIS 42539 (E.D.N.Y. Mar. 23, 2017) ..........2

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*,
   749 F.2d 124 (2d Cir. 1984)....................................................................................14

*Spear-Newman, Inc. v. E.I. du Pont de Nemours & Co.*,
   No. CIV.A.3:91-CV-00652, 1991 WL 318725 (D. Conn. Jan. 17, 1991)..............................15

*Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*,
   154 F. Supp. 2d 586 (S.D.N.Y. 2001)....................................................................3, 4

*Vestron, Inc. v. Nat'l Geographic Soc.*,
   750 F. Supp. 586 (S.D.N.Y. 1990) ........................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
   354 F. Supp. 2d 455 (S.D.N.Y. 2005)....................................................................12

**A.      The R&R Correctly Concluded that Oneida Will Suffer Irreparable Harm if Steelite Is Permitted to Sell SANT' ANDREA® Products from Royal Porcelain**

The R&R correctly found that Oneida will be irreparably harmed if Defendants' conduct

is permitted.  (DE 45 at 8-9.)  As the Magistrate Judge noted:

> Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm."  *Coastal Distribution, LLC v. Town of Babylon*, No. 05 CV 2032, 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), "Loss of good will is particularly hard to quantify because monetary damages do not 'redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" *Marks Org., Inc., v. Joles*, 784 F. Supp.2d 322 (S.D.N.Y. 2011); *see also EricMany Ltd. v. Agu*, 2016 U.S. Dist. LEXIS 73016; *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.*, 270 F. Supp. 2d 432, 435-36 (S.D.N.Y. 2003).

(DE 45 at 8-9.)

Steelite argues that Oneida has a quantifiable amount of lost sales (which continue to

accrue).  (DE 50 at 22.)  This is beside the point because much more than past sales have been

lost.  Injunctive relief prevents Oneida from losing the goodwill established in the development,

promotion, and sale of its SANT' ANDREA® tableware products.  As the R&R correctly finds,

"Oneida has been the supplier of this dinnerware to the foodservice industry for many years and

has expended considerable effort and money to build up this brand."  (DE 45 at 9.)

Steelite also argues that Oneida only invested in the trade*marks* that also cover the

product lines in the SANT' ANDREA® brand of products and not in the trade *dress* of those

products.  (DE 50 at 23.)  But, as the R&R explains, Oneida spent millions of dollars in the

development, promotion, and sale of its trade dress – not of its trademarked names of those

designs.  (DE 45 at 8-9.)

Steelite next offers new evidence by pointing to other companies' products.  (DE 50 at

24.)  This evidence was not presented to the Magistrate Judge and therefore is not included in the

R&R.  The Court need not consider evidence that was not presented to the Magistrate Judge. *E.g.*, *Riley v. Rivers*, No. 15-CV-5022, 2017 U.S. Dist. LEXIS 42539, at *5 (E.D.N.Y. Mar. 23, 2017) ("Generally, 'a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.'") (quoting *Fisher v. O'Brien*, No. 09-CV-42, 2010 WL 1286365, at *1 (E.D.N.Y. Mar. 30, 2010)).

### B.   The R&R Correctly Found That Oneida Owns Protectable Trade Dress in Its Tableware Designs

#### 1.   Oneida was the first to use its trade dress in commerce

Steelite's argument that the R&R "ignores the undisputed evidence that Tablewerks was the first to use the trade dress for the product designs at issue in commerce in the United States" is wrong.  (*Cf.* DE 50 at 3.)  Tablewerks did not use the trade dress; Tablewerks supplied Oneida, and only Oneida, with products pursuant an exclusive contract, the Vendor Agreement.  (DE 15-5 (Vendor Agreement) ¶¶ 4-5.)  The Magistrate Judge sets forth the correct inquiry in the R&R "the question is who first used it *commercially* and acquired superior rights to it."  (DE 45 at 11 (emphasis added).)  *Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985) (transportation of goods from manufacturer to owner of mark was not in commerce: "…it was a shipment of the goods in preparation for offering the goods for sale.  It did not make the goods available to the purchasing public.")  As the Magistrate Judge correctly found, Oneida was the first to use the trade dress designs to identify its tableware goods in a given *market* and continues to make use of the trade dress and thus is entitled to prevent others from using the trade dress to describe their own goods in that *market*.  (DE 45 at 11-12.)

### 2.      Oneida owns the trade dress in its SANT' ANDREA® products

The R&R correctly concludes that Oneida is the owner of the design trade dress in its tableware products.  (DE 45 at 11.)  Steelite attempts to interpret the Magistrate Judge's decision that Oneida is the owner of the design trade dress as being based solely on the allegations in Oneida's complaint.  (DE 50 at 5.)  This is inaccurate.  The Magistrate Judge considered all of the evidence that Oneida submitted including its verified complaint, declarations from Oneida employees, a declaration from an Oneida customer, and numerous exhibits – all of which support Oneida's claim that it owns the trade dress in its SANT' ANDREA® products.  (*See* DE 45 at 3-4; *see also* DE 1, 15-19 and exhibits thereto.)

The R&R properly and comprehensively considered the five factors courts use to determine who owns the trade dress as between a supplier and a distributor.  (DE 45 at 11-13.)  The five factors are:  (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; (4) with which party the public identified the product and to whom purchasers made complaints; and (5) which party possesses the goodwill associated with the product, or which party the public believes stands behind the product.  *E.g., Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1992, 2015 WL 845711, at *3 (S.D.N.Y. Feb. 26, 2015); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001).

As to the first factor, Steelite contends that Royal Porcelain owns the trade dress because it is the manufacturer of the goods.  (DE 50 at 4.)  Then, Steelite contradicts itself and says that Queensbury Hunt is actually the inventor of the trade dress.  (DE 50 at 7-8.)  Steelite ignores the R&R's finding that "[a]t all times from the creation of the design to the present, Oneida has been the party which has sold the dinnerware to consumers and the foodservices industry. Thus, this

factor weighs in favor of Oneida." (DE 45 at 12.) Queensbury Hunt was asked to create designs specifically for Oneida, with Oneida's significant input. (DE 18 (Gebhardt Decl.) ¶¶ 10-11, 16, 25.) Royal Porcelain was asked to manufacture tableware specifically and exclusively for Oneida. (DE 15-5 (Vendor Agreement) ¶¶ 4-5.) As the R&R points out, neither of these entities gave the tableware the benefit of its reputation and standing in the industry – instead, Oneida did this from the inception of the design through the present. (DE 45 at 11); *see also Tactica*, 154 F. Supp. 2d at 600 (presumption that manufacturer owns trade dress presumption is rebutted where there is evidence that when the "goods pass through the distributors hands," the distributor gives the goods the benefit of its reputation and standing in the industry).

Steelite next points to design patents and a copyright application. Oneida contributed significantly to the designs of the BOTTICELLI® and NEXUS™ dinnerware products. Paul Gebhardt, one of Oneida's lead designers, states:

> 10.     The design of the dinnerware manufactured by Royal Porcelain was typically a team effort, or collaboration, between Oneida's Foodservice team, which included me, Tablewerks, and the well-known English design firm of Queensberry Hunt. In this collective effort all features and items, including (but not limited to) overall size, capacity, handle opening, rim thickness, edge dimension, and aesthetic features would be evaluated, tested, approved, or adjusted to meet the specific needs of Oneida's foodservice customers with direction from the Oneida team. As new items were added to the line they were driven by trends in foodservice and developed at Oneida's request with our specific design direction.

> 11.     BOTTICELLI® and NEXUS™ dinnerware lines would be prime examples of this type of collaboration. Only with the key insights from Oneida would final designs be made by Royal Porcelain. Each piece's size, surface decoration/texture, weight, depth, and surface was discussed, validated or modified. The collaboration and insight that came from Oneida leveraged their unique understanding of the foodservice marketplace and their customer's needs. No single piece would reach our customer's hands or consumer markets without this rigorous collaboration.

(DE 18 (Gebhardt Decl.) ¶¶ 10-11.)  Thus, design patents and a copyright application are not evidence that support Steelite's position.

With respect to the second factor, Steelite argues that the words Royal Porcelain appear on the bottom of Oneida's products and thus it is associated with the product's designs.  (DE 50 at 8.)  The R&R acknowledges that Royal Porcelain's name is stamped on the bottom of Oneida's products.  (DE 45 at 12.)  However, the Magistrate Judge correctly found that the weight of the evidence would lead a buyer to conclude that it is Oneida's name that appears with the product design, not Royal Porcelain's.  (DE 45 at 12.)  Steelite's objections fail to mention that Oneida's SANT' ANDREA® brand name also appears on the bottom of Oneida's products, as was plainly evident from the exemplars inspected by Magistrate Judge at the February 27, 2017 hearing.  In any event, a marking is not viewable when the dinnerware is on the table.  *Cf. Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 959 (E.D.N.Y. 1992) (putting a different label on bottom of identical bottle does not dissipate confusion).  The mere fact that Royal Porcelain's name is on the bottom of Oneida's product or that Queensbury Hunt's name appears in Oneida's advertising does not change the fact that the products are Oneida's and only Oneida's and customers seeing the products, designs, and advertising would believe them to be Oneida's.  And in each instance, as found by the Magistrate Judge, Oneida's name and/or SANT' ANDREA® brand appears right alongside Royal Porcelain or Queensbury Hunt's name.  (DE 45 at 12 (citing DE 1-8 (Verified Complaint Exh. 2); DE 1-9 (Verified Complaint Exh. 3); DE 18-4 (Gebhardt Decl. Exh. 4); DE 18-5 (Gebhardt Decl. Exh. 5); DE 16-1 (Byron Decl. Exh. 1); DE 16-2 (Byron Decl. Exh. 2).)

Turning to the third factor, the R&R notes that Steelite offered evidence that in the dinnerware industry customers look to the manufacturer when assessing the quality of the goods.

(DE 45 at 12.)  The Magistrate Judge stated that "While these statements may provide support for assertions regarding the quality of the product, they do not shed light on which party maintained the quality or uniformity of the product."  (DE 45 at 12-13.)  Steelite now offers new arguments about an ISO9001:2008 certification and customer visits to the Royal Porcelain factory.  (DE 50 at 10.)  But none of the evidence of the ISO certification or visits to the Royal Porcelain factory was before the Magistrate Judge.  *See, e.g., Fisher*, 2010 U.S. Dist. LEXIS 31047, at \*3.  And, not all five factors need be shown.  *Barefoot Contessa*, 2015 WL 845711, at \*4.

With respect to the fourth factor, Steelite states that the R&R does not analyze with which party the public identified the product.  (DE 50 at 10.)  This is wrong.  Throughout the R&R the Magistrate Judge notes that the relevant public identifies the trade dress designs with Oneida.  (DE 45 at 12-13, 15.)  And, the R&R correctly concludes that based upon the evidence before it, "the Court gives greater weight to Plaintiff's conclusion that customers would voice complaints to Oneida, rather than to Royal Porcelain in Thailand."  (DE 45 at 13.)  Thus, this factor weighs in favor of Oneida.

Lastly, for the fifth factor, the R&R states that "a court may look at which party possesses the goodwill associated with the product, or which party the public believes stands behind the product."  (DE 45 at 13.)  The only evidence that Steelite identifies to support its argument that the public identifies the trade dress designs with Royal Porcelain is the Keck declaration.  (DE 50 at 10-11.)  The R&R specifically considered this evidence and rejected it.  (DE 45 at 12-13, 15.)  The R&R finds that Oneida is the only entity that has ever advertised, promoted, and sold in the market place the trade dress designs and thus this factor weighs in favor of Oneida.  (DE 45 at 13.)  Steelite's arguments that the R&R's findings are limited to the brand names of the

products is unavailing.  Oneida's products themselves are featured in the advertising and the products themselves are being sold via these sales and promotional activities.  (DE 1-8 (Verified Complaint Exh. 2); DE 1-9 (Verified Complaint Exh. 3); DE 18-4 (Gebhardt Decl. Exh. 4); DE 18-5 (Gebhardt Decl. Exh. 5); DE 16-1 (Byron Decl. Exh. 1); DE 16-2 (Byron Decl. Exh. 2).)  Thus, the R&R is entirely supported by the weight of the evidence and the Magistrate Judge was correct in her conclusion that the public identifies the trade dress designs with Oneida.

After considering all five factors, the R&R correctly concluded that Oneida "has presented evidence sufficient to raise serious questions going to the ownership of the trade dress of the BOTTICELLI and NEXUS dinnerware patterns."  (DE 45 at 13.)

C.   **The R&R Correctly Found That Oneida's Trade Dress in Its Tableware Designs Has Acquired Secondary Meaning**

Steelite asserts, without support, that "Oneida's purported evidence regarding secondary meaning or distinctiveness is based on the use of Oneida's trademarks and names, which the Supreme Court has cautioned is not relevant in trade dress design analysis."  (DE 50 at 14.)  Steelite's argument conflates Oneida's trademark rights in the *names* of its products with Oneida's trade dress rights in the products' *designs*.  In addition, Steelite completely ignores Oneida's evidence from its design leader, Paul Gebhardt, and its customer, Dan Hoffman, describing in great detail two examples of what Oneida's design trade dress is and that those particular trade dress designs are exclusively and immediately associated with Oneida.  (DE 18 (Gebhardt Decl.) ¶¶ 16-33; DE 19 (Hoffman Decl.) ¶¶ 10-14.)  Contrary to Steelite's assertion, Oneida clearly demonstrated that it has distinctive trade dress protection in its designs and is not relying on the trademark rights it has in the names of its SANT' ANDREA® products.

The R&R carefully considered the evidence presented by both parties and concluded that Oneida's evidence tipped the balance in favor of the determination that Oneida's trade dress had

acquired secondary meaning.  (DE 45 at 15.)  Steelite's arguments as to why Oneida's trade

dress designs purportedly have not acquired secondary meaning all miss the mark.  (DE 50 at 14-

17.)  First, Steelite argues that "Oneida has not explained how the products' design shape – the

trade dress design – has come to be associated with Oneida.  (DE 50 at 15.)  That is not credible.

Oneida went to great lengths in its memorandum in support of its motion for a temporary

restraining order and preliminary injunction to set forth its trade dress designs and describe how

those designs became associated with Oneida.  (DE 20 at 4-7, 13-20.)  Oneida has detailed:

- the marketing and advertising dollars spent on promoting and selling the trade dress designs (DE 20 at-17-18; *see also* DE 16 (Byron Decl.) ¶¶ 6-7.);

- the awards and recognitions it has received for its trade dress designs (DE 20 at 18-19; *see also* DE 18 (Gebhardt Decl.) ¶ 18 and Exhs. 1 and 2);

- the great success Oneida has had in selling its trade dress designs (DE 20 at 19; *see also* DE 16 (Byron Decl.) ¶¶ 10-11.);

- substantial advertising materials touting the trade-dress-protected designs alongside the Oneida®, SANT' ANDREA®, and other well-recognized Oneida brands (*e.g.*, BOTTICELLI® and NEXUS™) (DE 20 at 17-18; *see also* DE 16 (Byron Decl.) ¶¶ 6-7; DE 18-4 (Gebhardt Decl. Exh. 4).);

- that Oneida has exclusively sold the trade dress designs for many years (DE 20 at 20; *see also* DE 19 (Hoffman Decl.) ¶¶ 13-14.); and

- a third-party customer's sworn declaration that unequivocally states that when he sees the trade dress designs, he automatically knows they are Oneida products (DE 20 at 18; *see also* DE 19 (Hoffman Decl.) ¶¶ 13-14.)

Steelite's argument that all of this evidence is only relevant to Oneida's brand names or

trademarks and not to the designs themselves is factually incorrect.  (DE 50 at 15.)  And,

Oneida's customer's testimony specifically states that when he sees Oneida's trade dress designs,

he immediately associates them with Oneida.  (DE 19 (Hoffman Decl.) ¶ 14.)

Second, Steelite argues that the R&R failed to consider whether Oneida's product design

features are generic and not protectable as trade dress.  (DE 50 at 15.)  To support its argument,

Steelite points to a miniscule collection of other products that it claims have the same features as Oneida's BOTTICELLI® design.  (DE 50 at 16.)  Again, this evidence was not before the Magistrate Judge.  *Cf., e.g., Fisher*, 2010 U.S. Dist. LEXIS 31047, at *3.  In any event, it is insufficient to disqualify Oneida's trade dress from eligibility.  As the R&R found, Oneida's evidence, particularly the Hoffman declaration, demonstrates that customers who see a SANT' ANDREA® product design immediately associate that design with Oneida.  (DE 19 (Hoffman Decl.) ¶ 14.)  The R&R correctly concluded that Oneida's trade dress had acquired secondary meaning and a few examples of later products that Steelite claims look like Botticelli do no disturb the Magistrate Judge's conclusions.

### D.   The R&R Correctly Found a Likelihood of Confusion Between Oneida's SANT' ANDREA® Products and Steelite's Exact Copies

Steelite accurately states that this case is about Oneida's trade dress rights in its product *designs* – not the *packaging* of the products.  (DE 50 at 3.)  Therefore, it is curious that Steelite then looks to its alleged packaging of its products to support its argument that there could be no likelihood of confusion between Oneida and Steelite's products.  (DE 50 at 18; DE 50-1 ¶ 12.)

Steelite admits that it intends to take Oneida's exact designs and use them on its own products.  Thus, the R&R was correct that "[b]ecause Steelite seeks to sell the exact dinnerware, produced by the same manufacturer, there can be no doubt that consumer confusion will follow.  As such, Plaintiff has demonstrated a likelihood of success on the merits with respect to that element of its claim."  (DE 45 at 14 n. 3.)  There can be no greater instance of a likelihood of confusion than when one party intends to sell an exact copy of another party's products (here, the very item without alteration).

### E.      The R&R Correctly Determines that the Balance of Hardships Weighs in Favor of Oneida

The R&R rightly states that the balance of hardships weighs in Oneida's favor because it has invested in and sold the SANT' ANDREA® line of products for years whereas Steelite has never sold the products directly to consumers.  (DE 45 at 15.)  Thus, the Magistrate Judge concluded, "Oneida faces a considerable loss of goodwill from its inability to fulfill outstanding orders and the uncertainty created by the actions of Defendants at recent trade shows."  (DE 45 at 16.)

Steelite's objections to this conclusion entirely miss the point.  First, Steelite argues that Royal Porcelain has the right to distribute its products to whomever it sees fit and that there are no agreements between Royal Porcelain, Tablewerks, and Oneida.  (DE 50 at 20.)  This is false.  There is a Vendor Agreement between Oneida and Tablewerks that requires Royal Porcelain and Tablewerks to sell any products using designs developed or used by Oneida *only to Oneida*.  (DE 15-5 (Vendor Agreement) ¶¶ 4-5.)  Oneida invested more than $380,000 for tooling used at Royal Porcelain to make one of Oneida's most iconic dinnerware lines, NEXUS™. (DE 18-1; DE 18 (Gebhardt Decl.) ¶ 12.)

Second, the R&R correctly points out, "any harm Defendants face is a result of their own actions."  (DE 45 at 16); *see also Barefoot Contessa*, 2015 WL 845711, at *8.  "Defendant Steelite took a risk in acquiring Tablewerks and attempting to cut Oneida out of the process and sell goods directly to consumers on their own."  (DE 45 at 16.)  Steelite attempts to distinguish *Barefoot Contessa* by arguing that in that case the packaging the defendant was using was found to be identical to the packaging the plaintiff was using and therefore because it involved packaging, it does not apply here.  (DE 50 at 20.)  This is not a point of actual distinction. *Barefoot Contessa* held that the parties were selling identical products and the defendant did so

- 10 -

to its own detriment and at its own risk.  2015 WL 845711, at *8.  Similarly here, Steelite will be selling identical products to Oneida – products protected by Oneida's trade dress – and therefore the balance of hardships tips in favor of Oneida.  (DE 45 at 16-17.)

### F.     Oneida Is Entitled to an Injunction

Oneida's motion for a temporary restraining order included a provision that *Steelite* be enjoined from *refusing* to accept and fulfill any commercially-reasonable purchase order that Oneida presents for product sourced through Royal Porcelain bearing Oneida's SANT' ANDREA® brand.  (DE 14 (Order to Show Cause) at 2.)  This is not a mandatory injunction.

Moreover, Steelite has never suggested that Royal Porcelain is unable or unwilling to fill Steelite's orders for SANT' ANDREA products.  Steelite simply notes that Royal Porcelain is not a party.  (DE 50 at 24.)  Steelite stated numerous times in its objections to the R&R that it has an exclusive contract with Royal Porcelain for the supply of tableware products that include Oneida's trade dress.  (DE 50 at 4-5, 20.)  Therefore, if this Court enjoins Steelite from refusing to accept Oneida's commercially-reasonable orders, Steelite would simply request that Royal Porcelain manufacture the products and send them to Steelite which would in turn send them to Oneida, who pays Steelite for all of the products it received.  This is the exact arrangement that Oneida had with Steelite's predecessor, Tablewerks, and thus it is quite practicable for Steelite to be required to continue to supply Oneida with tableware products.

In addition to its factual infirmities, Steelite's claim that this provision of the temporary restraining order rises to the level of a mandatory injunction requiring a heightened showing also fails as a matter of law.  The Second Circuit prescribes that "[m]andatory injunctions . . . are those that disturb the status quo by ordering affirmative relief" and considers injunctions that merely require a party to do what it should have done earlier not to be mandatory.  *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988) (noting that "[w]hile the interim relief here was

mandatory in the sense that the order required the union to expend funds it perhaps otherwise would not have spent, it actually only required the union to do what it should have done earlier" in holding that application of the mandatory injunction standard was not required). Indeed, courts hold that preliminary injunctive relief does not constitute a mandatory injunction where it merely compels a party to take an action required by its contractual obligations. *See Alcatel Space, S.A. v. Loral Space & Commcn's Ltd.*, 154 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2001) (finding that an injunction requiring disclosure of information to a party entitled to it by contract required was not a mandatory injunction and noting that while the injunction "require[d] . . . positive acts, those acts [we]re necessary to preserve the status quo"); *see also Nordic Windpower USA, Inc. v. Jacksonville Energy Park*, LLC, No. 5-12-cv-12, 2012 U.S. Dist. LEXIS 55552, at *25-27 (D. Vt. Apr. 18, 2012) (finding that the mandatory injunction standard did not apply where the injunction related to activities contemplated by a contract between the parties and were not beyond the expectations of the parties); *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) (holding that a preliminary injunction requiring an insurer to advance defense costs was not mandatory where "the policy language strongly supports [the] argument that [the insurer] should already have been advancing defense costs"); *Great Am. Ins. Co. v. Gross,* No. 3:05CV159, 2005 U.S. Dist. LEXIS 8003, at *13 (E.D. Va. May 3, 2005) (holding that an injunction requiring an insurer to advance defense costs where the policy language obligated the insurer to do so until it was finally established that the insurer was not liable under the policy was not a mandatory injunction). This is the same fact pattern as here – Tablewerks/Steelite is required to supply Oneida with its SANT'ANDREA® tableware under the Vendor Agreement.

As the Magistrate Judge found the temporary restraining order set forth in the R&R merely preserves the *status quo*.  (*See* DE 45 at 16.)   Prior to the events leading to this dispute, Steelite/Tablewerks has exclusively sold the relevant products to Oneida for Oneida's SANT' ANDREA® line for many years as required by the Vendor Agreement.  *See XL Specialty Ins. Co. v. Level Global Investors*, L.P., 874 F. Supp. 2d 263, 271-72 (S.D.N.Y. 2012) (finding that an injunction requiring an insurer to advance defense costs as required by the policy was not mandatory where the insurer had terminated the payments because "the status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the controversy").  Further demonstrating that the injunction is not mandatory, there is nothing to suggest that Steelite will be deprived of meaningful remedy if preliminary injunctive relief is issued and it were somehow to prevail at trial.  *See, e.g.*, *Nordic Windpower*, 2012 U.S. Dist. LEXIS 55552, at *26-27.  Any loss incurred by Steelite for the delay in its sales activities while enjoined from refusing Oneida's purchase orders can be remedied by money damages, and Oneida has posted a substantial bond for this purpose.  (DE 36, 46.)  At any rate, Steelite will be hard pressed to show any loss from an injunction merely preventing it from refusing commercially-reasonable purchase orders.  Finally, a preliminary injunction would not give Oneida all of the relief it would be entitled to after a full trial on the merits, which would include damages and injunctive relief going forward after the trial – a preliminary injunction would only maintain the status quo by requiring Steelite not to refuse to accept and fulfill commercially reasonable purchase orders from Oneida until trial on the merits case is completed.  *See, e.g., Great Am. Ins.*, 2005 U.S. Dist. LEXIS 8003 at *12-13 (holding that a preliminary injunction requiring an insurer to advance defense costs until the court could make a determination regarding the claims in the case was not a mandatory injunction and noting that the preliminary

- 13 -

injunction did not give the moving party all the relief it would be entitled to if it prevailed on the merits because the preliminary injunction would not require payment of the entirety of the defense costs, which an adjudication on the merits against the insurer would); *see also Alcatel*, 154 F. Supp. 2d at 580.

Steelite's reliance on *Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir. 1985), is misplaced.  In *Abdul Wali*, the court applied the heightened mandatory injunction standard in affirming an injunction that altered the *status quo* despite the fact that it found the injunction "more prohibitory than mandatory in nature."  *Id*. at 1026.  The court did not address whether or under what, if any, circumstances an injunction that preserved the *status quo*, such as the one at issue here, could be considered mandatory or subject to the heightened standard.

Even assuming *arguendo* that Oneida has requested a "mandatory injunction," the case law imposing a mandatory injunction on a party supports Oneida's request and the March 14 R&R.  There are several cases in the Second Circuit that have required a defendant supplier to continue supplying products to a plaintiff distributor as part of an injunction prohibiting defendant supplier from terminating an exclusive distributorship.  For example, in *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124, 124-27 (2d Cir. 1984), the Second Circuit reversed the district court and enjoined the supplier (Coca-Cola) from treating the supply agreement as terminated and required that it continue to supply the distributor with product.  *Id.* at 124-27 (ordering entry of "a preliminary injunction prohibiting Coca-Cola from terminating Roso-Lino's distributorship"); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (reversing district court's denial of preliminary injunction and instructing district court on remand to issue preliminary injunction ordering supplier to continue furnishing plaintiff distributor with photographs to distribute pending litigation over the disputed

- 14 -

contract); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 583 (W.D.N.Y. 2011) (requiring ink supplier to continue supplying Kodak with ink that it had distributed with its inkjet printers); *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 388 (S.D.N.Y. 2002) (issuing temporary restraining order requiring furniture manufacturer to continue its relationship with distributor and fulfill and ship plaintiff's orders); *Spear-Newman, Inc. v. E.I. du Pont de Nemours & Co.*, No. CIV.A.3:91-CV-00652, 1991 WL 318725, at *10 (D. Conn. Jan. 17, 1991) (granting an injunction prohibiting defendant from terminating plaintiff's twenty-year distributorship of defendant's Corian product); *Vestron, Inc. v. Nat'l Geographic Soc.*, 750 F. Supp. 586, 594 (S.D.N.Y. 1990) (granting preliminary injunction requiring defendant to continue to supply plaintiff distributor with the tapes it had been supplying plaintiff under a distribution agreement); *Givenchy S.A. v. William Stuart Indus.*, No. 85 CIV. 9911 (PKL), 1986 WL 3358, at *7 (S.D.N.Y. Mar. 10, 1986) (granting injunction prohibiting plaintiff from terminating exclusive license agreement permitting defendant to distribute products bearing plaintiff's name and trademarks).  Thus, even if Oneida's request is for a mandatory injunction, the case law supports the situation where a supplier, Tablewerks/Steelite, is required to continue supplying goods to a seller of the goods, Oneida. Oneida has met the standard for a mandatory injunction.

*     *     *

The March 14 R&R concludes that Oneida has met its burden to warrant continuing the TRO against Defendants until a decision can be rendered on Oneida's preliminary injunction motion.  (DE 45.)  Oneida respectfully requests that this Court adopt the March R&R with the modifications Oneida requested in its March 28, 2017 objections.  (DE 49.)

Dated:   April 11, 2017                   Respectfully submitted,

                                          MILBANK, TWEED, HADLEY & MCCLOY LLP


                                          By:   */s/ Christopher J. Gaspar*
                                          Mark C. Scarsi
                                          2029 Century Park East – 33rd Floor
                                          Los Angeles, CA 90067
                                          (424) 386-4000

                                          Christopher J. Gaspar
                                          Nathaniel Browand
                                          28 Liberty Street
                                          New York, NY 10005
                                          (212) 530-5000

                                          Kristin L. Yohannan (admitted *pro hac vice*)
                                          1850 K Street, NW, Suite 1100
                                          Washington, D.C. 20006
                                          (202) 835-7500

                                          *Attorneys for Plaintiff*
                                          *The Oneida Group Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Response to Defendant Steelite

International's Objections (DE 50) To The Report And Recommendation of March 14, 2017 was

filed electronically on April 11, 2017.  Notice of this filing will be sent to all parties by operation

of the Court's electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Nathaniel Browand*
Nathaniel Browand