**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ONEIDA GROUP INC.<br><br>     Plaintiff,<br><br>    - against -<br><br>STEELITE INTERNATIONAL U.S.A. INC.,<br>TABLEWERKS, INC., RICHARD ERWIN, STEVEN<br>LEFKOWITZ, and ANTHONY DELOSREYES<br><br>     Defendants. | Civil Action No.: 2:17-cv-00957<br>(ADS) (AKT) |

**PLAINTIFF THE ONEIDA GROUP INC.'S
<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

I.     **PROPOSED FINDINGS OF FACT**

Plaintiff The Oneida Group Inc. ("Oneida") incorporates by reference in these Proposed

Findings of Fact all exhibits admitted into evidence during the Preliminary Injunction hearing as

well as those documents attached as exhibits to papers Plaintiff filed with the Court.

A.     **Oneida Has Unique Expertise With Dinnerware in the Foodservice Industry**

1.     Oneida is one of the world's largest designers and suppliers of dinnerware for the

consumer and foodservice industries.  Plaintiff's Trial Exhibit ("PTX") 27 ("Gebhardt Decl.")

¶ 4, PTX 33 ("Hoffman Decl.") ¶ 9.

2.     Oneida has been in business for over a century, and has been in the dinnerware

business for several decades.  Hearing Transcript ("Tr.") 61:7-14.

3.     Oneida's most popular and heavily promoted dinnerware lines are within its

SANT' ANDREA® brand of products.  Tr. 53:6-8.

4.     Oneida's SANT' ANDREA® product line includes sixteen different design

patterns, two of the most important of which are Oneida's BOTTICELLI® and NEXUS™

designs.  Tr. 58:21-59:16, 65:21-66:15, 69:18-74:10.

5.     Oneida's foodservice industry customers consist largely of hotels, restaurants,

casinos, cruise ships, and other similar commercial enterprises.  Specific examples of customers

that purchase Oneida's SANT' ANDREA® products include Royal Caribbean Cruise Line,

Hilton, Hyatt Hotels, Darden, and Brinker.  Tr. 61:15-21, 276:20-277:1.

6.     Oneida's expertise in the foodservice industry puts it in a unique position to know

what product features will be successful with foodservice customers.  Tr. 282:10-18, 297:3-22,

326:20-327:18, 802:20-805:2; PTX 11 ("Byron Decl.") ¶ 3.

**B.      The BOTTICELLI® and NEXUS™ Dinnerware Products**

7.      Oneida developed the BOTTICELLI® and NEXUS™ dinnerware product designs in collaboration with a design team called Queensberry Hunt.  Tr. 100:2-102:15, 102:21-103:10, 272:25-276:9, 281:17-304:7, 318:16-322:5, 322:13-327:18; Gebhardt Decl. ¶¶ 10-11, 16, 25.

8.      Queensberry Hunt does not develop designs for dinnerware intended for foodservice customers, like the hotels and casinos that purchase the BOTTICELLI® and NEXUS™ dinnerware, and instead relies on Oneida to supply details of the wants and needs of the foodservice industry.  Tr. 771:21-772:8, 800:19-801:3; *supra* ¶¶ 6-7.

9.      The raw design concepts suggested by Queensberry Hunt were abstract design concepts limited to plates and did not encompass other items such as cups, bowls, etc.  Tr. 291:6-292:17, 664:15-666:11.

10.      The raw design concepts suggested by Queensberry Hunt became the designs seen on the multi-product BOTTICELLI® and NEXUS™ lines including plates, cups, bowls, etc. after consultation with Paul Gebhardt and Oneida.  Tr. 766:24-767:12; *supra* ¶¶ 6-9.

11.      Oneida participated in and substantially contributed to the design of the BOTTICELLI® and NEXUS™ dinnerware products by exercising control over the design direction and channeling invaluable product design input to the design firm Queensberry Hunt through Oneida's "conduit," Richard Erwin.  Tr. 201:9-16, 800:19-801:3, 802:20-805:2; *supra* ¶¶ 6-10.

12.      Oneida rejected the original design Queensberry Hunt presented for consideration for the BOTTICELLI® pattern, which did not include texturing on the top surface of the plate, because based on its industry experience, a bleed-through of the plate's bottom geometry on the plate's top surface was undesirable.  Tr. 281:17-304:7, 318:16-322:5, 800:11-15.

- 2 -

13.     Queensberry Hunt worked with the Oneida design team to adapt and develop the BOTTICELLI® pattern based on the needs of the marketplace into what is now a product line consisting of approximately forty-five different items, each item having received express approval by Oneida.  Gebhardt Decl. ¶ 17; *supra* ¶¶ 6-12.

14.     The Oneida-approved design sold as BOTTICELLI® dinnerware features a combination of a steep-angled rim, a circle-shaped texturing around the outer surface, a smooth interior area differentiated from the texturing of the outer surface, and a rim geometry that tapers from a thick portion near the end of the rim to a rounded edge at the tip of the rim.  Tr. 54:14-20; Gebhardt Decl. ¶ 20, Hoffman Decl. ¶ 11; PTX 12, PTX 69, PTX 103.

15.     Oneida involved Queensberry Hunt in the development of the NEXUS™ dinnerware at a design summit meeting at Oneida's New York City Showroom on April 20, 2006, where Oneida presented Queensberry Hunt with a design brief identifying Oneida's design parameters for its new product line.  Tr. 272:25-276:9, 309:8-310:21; PTX 62.

16.     Queensberry Hunt displayed for Oneida a prototype of a plate concept at the April 20, 2006 meeting, but that prototype was only a design starting point that did not include all of the iconic features of the Oneida's NEXUS™ dinnerware; for instance, the distinct arc-like ribbing of the NEXUS™ dinnerware did not originate until after the April 20 meeting between Queensberry Hunt and Oneida.  Tr. 309:8-310:21, 780:9-781:9.

17.     The Oneida-approved design sold as NEXUS™ dinnerware features a combination of a decal comprising decorative concentric circles on the outer surface, a square-shaped smooth surface framed by the decal on round plates, a trapeze-like arcuate-shaped inside smooth surface framed by the decal on rectangular plates, the juxtaposition of square and circle shapes within a single piece, and either the use of a standard foot ring or flat foot surface on the

bottom of all products.  Tr. 55:3-6; Gebhardt Decl. ¶ 29, Hoffman Decl. ¶ 12, PTX 13, PTX 72.

18.     Oneida paid approximately $380,000 to acquire the isostatic tooling necessary to manufacture certain NEXUS™ dinnerware products, which is installed in the Royal Porcelain factory.  Tr. 141:25-145:7, 326:20-328:17; Gebhardt Decl. ¶ 12, PTX 28.

19.     Oneida has only ever sourced SANT' ANDREA® dinnerware from the Royal Porcelain factory through Tablewerks.  Oneida's current inventory of SANT' ANDREA® dinnerware from Royal Porcelain will last until approximately October 2017.  Tr. 203:16-204:6, 311:1-7.

**C.     The Distinctive BOTTICELLI® and NEXUS™ Dinnerware Are Symbols of Oneida**

20.     Oneida has been the exclusive distributor of BOTTICELLI® dinnerware in North America since Oneida launched the product in 2001.  Tr. 146:24-147:2, 147:14-22, 153:18-23, 154:12-155:2, 157:9-158:13, 591:17-592:4, 762:19-763:12; Gebhardt Decl. ¶¶ 17, 22, PTX 3, PTX 50, PTX 51, PTX 103, PTX 119.

21.     Oneida has been the exclusive distributor of NEXUS™ dinnerware in North America since Oneida launched the product in 2009.  Gebhardt Decl. ¶¶ 26, 31; *supra* ¶ 20.

22.     When BOTTICELLI® dinnerware first launched, it was not immediately successful.  Tr. 737:17-20.

23.     Since Oneida launched its exclusive SANT' ANDREA® brand in 1998, Oneida has invested approximately $48 million—an average of more than $2,500,000 per year—in promoting and selling the products within the SANT' ANDREA® line, including the BOTTICELLI® and NEXUS™ products.  Tr. 76:6-84:16; PTX 12, PTX 13, PTX 61, PTX 103, PTX 115.

24.     Oneida has established marketplace familiarity with its SANT' ANDREA®

dinnerware products, especially its BOTTICELLI® and NEXUS™ dinnerware, by aggressively marketing to customers through product catalogs, trade shows, trade publication advertisements, social media, internet, and sales collateral.  Tr. 77:23-94:20, 213:4-22; Hoffman Decl. ¶ 13.

25.     Oneida's advertising material emphasizes its dinnerware's design features, like BOTTICELLI®'s "dramatic steep rim embossed with hand-carved textures" and NEXUS™'s "unique, arcing Nexus decoration adorn[ing] the fashion-forward Trapeze shape."  Tr. 214:1-215:1; Hoffman Decl. ¶ 10, PTX 12, PTX 13, PTX 115.

26.     Oneida has received multiple awards in the dinnerware industry for its BOTTICELLI® dinnerware design, including winning the 2015 Hotel Experience Show Tabletop Competition; the 2014 Banquet and Catering, First Place; and the 2014 Club and Resort, Honorable Mention.  Tr. 95:7-96:8; Gebhardt Decl. ¶ 18, PTX 29-30.

27.     The BOTTICELLI® dinnerware design has received publicity from third-party journalists, as well as unsolicited media coverage in programs like Tabletop Journal and Iron Chef TV.  Tr. 93:19-94:20, 238:3-6; PTX 5; PTX 114.

28.     The NEXUS™ dinnerware design has been highlighted in the media by third-party journalists.  Tr. 238:3-6.

29.     Oneida is the only entity to have advertised, marketed, or otherwise promoted BOTTICELLI® and NEXUS™ dinnerware; neither Steelite nor Tablewerks nor Royal Porcelain have done so.  Tr. 482:10-23; Hoffman Decl. ¶ 13; *supra* ¶¶ 20-28.

30.     BOTTICELLI® and NEXUS™ dinnerware have become extremely popular and successful, selling approximately $7 million per year and $800,000 per year, respectively. Tr. 66:12-15, 69:18-74:10, 213:4-22; Hoffman Decl. ¶¶ 9, 13-14, PTX 8, PTX 46.

31.     The designs of the BOTTICELLI® and NEXUS™ dinnerware are distinctive in

the foodservice marketplace.  Tr. 214:21-24, 215:3-6; Hoffman Decl. ¶¶ 10, 13-14.

32.     There are many hundreds of dinnerware patterns on the market, but Defendants have only identified three they suggest resemble Oneida's BOTTICELLI® trade dress.  Even when faced with these three supposedly similar products, consumers still believe that the look and feel of BOTTICELLI® dinnerware is distinctive.  The three products identified by Defendants are attempts to plagiarize Oneida's BOTTICELLI® trade dress.  Tr. 215:7-217:3, 738:17-23; Defendants' Exhibit ("DX") GG, DX HH, DX II.

33.     Defendants have identified no patterns they suggest resemble Oneida's NEXUS™ trade dress.  Tr. 738:24-739:2.

34.     Allan Keck, witness for the Defendants and President of TriMark R.W. Smith ("R.W. Smith"), did not write the declaration he submitted and instead had it supplied to him by Steelite President John Miles.  Tr. 689:16-23; DX W; PTX 121.

35.     Although Keck claimed to have experience with BOTTICELLI® and NEXUS™, R.W. Smith does not regularly sell or show those products.  Tr. 696:2-23; DX W.

36.     As a result of Oneida's continuous and effective efforts in promoting its dinnerware for nearly two decades, dinnerware customers directly associate the designs of BOTTICELLI® and NEXUS™ dinnerware with a single source—Oneida.  Tr. 213:13-22, 214:21-215:6, 333:4-334:9; Hoffman Decl. ¶ 13-14.

**D.     Customers Know that Oneida Is the Company that Stands Behind the BOTTICELLI® and NEXUS™ Products**

37.     Oneida was the first entity to sell products bearing the BOTTICELLI® and NEXUS™ designs to foodservice customers in North America.  *Supra* ¶¶ 20-21.

38.     Since the products' launch, Oneida is the only company to have marketed BOTTICELLI® and NEXUS™ dinnerware in North America.  Tr. 482:10-23; Hoffman Decl.

¶ 13; *supra* ¶¶ 22, 29.

39.     Oneida prominently displays its name alongside the BOTTICELLI® and NEXUS™ designs in the marketplace.  Hoffman Decl. ¶ 13-14, PTX 12, PTX 13, PTX 36, PTX 103.

40.     Customers do not care about the backstamp on the underside of a dinnerware item or the packaging used to ship the dinnerware.  Tr. 64:13-65:8, 693:3-22.

41.     In promotional and sales materials provided to dinnerware customers, the names of Tablewerks, Inc. and Royal Porcelain do not appear with BOTTICELLI® or NEXUS™ products.  Tr. 67:16-69:3, 734:18-735:5; PTX 12, PTX 13, PTX 36, PTX 103.

42.     Oneida began its promotional and sales activities relating to BOTTICELLI® and NEXUS™ products as soon as they were launched in 2001 and 2009, respectively.  *Supra* ¶¶ 20-31, 36-42.

43.     BOTTICELLI® and NEXUS™ customers direct their product-related inquiries to Oneida.  Tr. 333:4-334:9.

44.     Oneida ensures the quality of its BOTTICELLI® and NEXUS™ products in the marketplace by supplying product-related customer service, performing quality assurance testing, and directing factory activities relating to product quality.  Tr. 106:14-108:3, 330:8-331:8, 333:4-334:9, 817:4-829:15; PTX 107, PTX 110, PTX 111, PTX 116, PTX 117, PTX 122-125.

45.     Oneida offers, and pays for, a three-year no chip warranty to purchasers of its SANT' ANDREA® products, including BOTTICELLI® and NEXUS™.  Neither Royal Porcelain nor Tablewerks pays for any such warranty costs.  Tr. 104:7-25, 330:8-331:8; PTX 12, PTX 13.

46.     Oneida has a Foodservice Customer Service team dedicated to resolving customer service inquiries from Oneida's customers.  This team spends 35% of its time handling inquiries relating to the SANT' ANDREA® dinnerware line, both from end customers directly and from dealers on behalf of customers.  Tr. 106:14-108:3; PTX 111.

47.     When Oneida receives product quality complaints from its customers, including complaints related to SANT' ANDREA® products, Oneida makes its personnel available to physically travel to customer locations to evaluate and resolve the product issue at the customer's convenience.  Tr. 108:15-111:11; PTX 116, PTX 117.

48.     Oneida maintains the uniformity of its BOTTICELLI® and NEXUS™ products by advising and directing the activities of the Royal Porcelain factory from which it sources those products to ensure that the manufactured products are satisfactory to its customer needs. Tr. 610:25-611:5, 613:6-616:5, 616:17-22; PTX 107, PTX 110.

49.     Oneida has a Quality Engineering team responsible for quality assurance testing on SANT' ANDREA® products, including BOTTICELLI® and NEXUS™ dinnerware, which includes a variety of tests indicative of product quality such as rim impact testing, center point testing, metal marking testing, color evaluation testing, glaze testing, thermal testing, water absorption testing, and dimensional testing.  Tr. 817:4-829:15; PTX 122-125.

**E.      There Is Strong Evidence of Actual Customer Confusion Caused by Steelite's Infringing Products**

50.     At the NAFEM trade show on February 9-11, 2017 in Orlando, Florida, Steelite had a booth where it offered to sell several dinnerware items identical in appearance to products Oneida has been selling under its SANT' ANDREA® brand since as early as 2001.  Tr. 497:7-498:9; PTX 20 ("Del-Cid Decl.") ¶¶ 5-12, PTX 22-26, PTX 73, PTX 74.

51.     Steelite intends to sell products identical in appearance to the dinnerware Oneida

has been selling as BOTTICELLI® since 2001 under the new name "Belisa."  Tr. 497:7-17; Del-Cid Decl. ¶¶ 5-8, PTX 2, PTX 22.

52.     Steelite intends to sell products identical in appearance to the dinnerware Oneida has been selling as NEXUS™ since 2009 under the new name "Vortex."  Tr. 497:18-21; Del-Cid Decl. ¶¶ 5-12, PTX 2, PTX 23.

53.     By looking at the products' appearance, shape, and pattern, there is no way to distinguish between the accused products Steelite is intending to sell and the dinnerware products Oneida has been selling under its SANT' ANDREA® brand.  *Supra* ¶¶ 50-52.

54.     Steelite's efforts to sell products identical to those Oneida has been selling for years under its SANT' ANDREA® brand has caused actual confusion among dinnerware customers, and is likely to continue to cause confusion, regarding the source of dinnerware designs historically sold by Oneida.  Tr. 116:19-119:22, 120:25-121:16, 123:18-19, 124:2-126:6, 316:24-317:3; Del-Cid Decl. ¶¶ 5-12, PTX 2, PTX 21.

55.     Oneida's goodwill and business reputation have suffered as a result of the consumer confusion caused by Steelite's actions, which has caused customers to lose confidence in Oneida's stability and ability to provide continued supply of products with SANT' ANDREA® designs.  Tr. 128:6-129:23, 136:22-138:2; *supra* ¶ 53-54.

56.     When making purchasing decisions, dinnerware customers are not influenced by the packaging in which the dinnerware is shipped.  Tr. 64:13-65:8, 693:3-22.

**F.     Steelite Is Attempting to Capitalize on the Goodwill Oneida Established in Its SANT' ANDREA® Products**

57.     Steelite and Tablewerks did not tell Oneida about the plan to cut off Oneida's supply of its Royal Porcelain-manufactured products until Steelite sent a December 13, 2016 letter to Oneida.  Tr. 117:23-118:3, 522:19-22; PTX 2.

- 9 -

58.     Steelite intentionally chose to sell dinnerware products identical to those Oneida previously sold as its BOTTICELLI® and NEXUS™ products.  Tr. 495:22-496:11, 497:7-21; PTX 2; *supra* ¶¶ 50-56.

59.     Steelite did not seek to avoid confusion between its products and Oneida's BOTTICELLI® and NEXUS™ products.  Tr. 495:22-496:11, 497:7-21; *supra* ¶¶ 50-56.

60.     Steelite is targeting Oneida's existing SANT' ANDREA® customers, taking advantage of customer relationships forged by Oneida, and contacting them to sell the same dinnerware patterns as Oneida's SANT' ANDREA® products.  Tr. 497:7-498:9; Del-Cid Decl. ¶ 5-12, PTX 21, PTX 73, PTX 74.

61.     Steelite has told Oneida's existing SANT' ANDREA® customers that if they want to continue buying the SANT' ANDREA® products Oneida has historically sold them they would only be able to purchase those products through Steelite.  Tr. 497:7-498:9; Del-Cid Decl. ¶¶ 5-12, PTX 21.

62.     Steelite has been representing to the marketplace that Steelite owns all of the rights in the SANT' ANDREA® products previously sold by Oneida and that Oneida can no longer supply those products.  Byron Decl. ¶¶ 16-22, PTX 21.

63.     Despite a Court order, Steelite failed to timely accept certain Oneida purchase orders for SANT' ANDREA® dinnerware.  Tr. 510:11-511:12; DE 8, DE 33.

64.     At the time Steelite told customers that it purportedly had all of the rights in the SANT' ANDREA® products previously sold by Oneida, Steelite had not considered Oneida's trade dress rights in those products.  Tr. 474:11-14.

65.     Royal Porcelain is using tooling purchased and owned by Oneida to manufacture NEXUS™ products that Steelite is selling in competition with Oneida.  Tr. 498:19-21, 508:16-

20, 509:11-16; *supra* ¶ 18.

G.   **Oneida's Business Vendor Requirements Is Written Evidence of
Tablewerks' and Oneida's Exclusivity Agreement**

66.   Oneida's Business Requirements for All Vendors for Oneida, Ltd. agreement

("Vendor Agreement") is a fifteen-page document stating that any design used for the

manufacture of goods for Oneida, whether provided by Oneida or its vendor, shall be for the sole

and exclusive use of Oneida.  PTX 6 at ¶¶ 4-5.

67.   Oneida's Vendor Agreement also provides that in the event a supplier refuses or

fails to provide goods specified in a purchase order, the supplier shall confer upon Oneida a non-

exclusive license permitting it to purchase identical goods in the open market.  PTX 6 at ¶ 8.

68.   Page 2 of the Vendor Agreement contains a Table of Contents indicating that the

document includes multiple numbered pages, including a Code of Conduct on page 4, Quality

Guidelines on page 7, Procurement Terms and Conditions on pages 8-12, a Conflict of Interest

policy on page 13, and a Suppliers Acknowledgement Form on page 14.  PTX 6.

69.   Page 3 of the Vendor Agreement specifically explains that a supplier can assent to

the terms of Oneida's Vendor Agreement without signing the Supplier Acknowledgment Form:

"The terms and conditions of each of these documents **shall apply to all orders for goods**

**and/or services placed by Oneida Ltd.**  Your failure to sign and return the Supplier

Acknowledgment Form will not affect the applicability of those documents.  By supplying goods

and/or services under an Oneida Ltd. Purchased [sic] order you agree to be bound by all terms

and conditions of each such document."  PTX 6 (emphasis in original).

70.   Tablewerks' President, Richard Erwin, signed Oneida's Vendor Agreement on

page 4, right next to Oneida's signature, and returned it to Oneida sometime between April and

July 2007.  Tr. 146:21-147:2, 147:14-149:2, 149:17-23, 151:1-151:19, 573:9-20; PTX 6,

PTX 52.

71.      For the entire time period during which Tablewerks and Oneida dealt with each other, beginning in 1996, the parties have conducted business in the manner required by the Vendor Agreement.  Tr. 146:24-147:2, 147:14-148:8, 582:23-583:6, 586:10-14, 589:8-590:4, 591:17-592:4; PTX 6.

72.      Tablewerks has accepted hundreds of Oneida purchase orders for SANT' ANDREA® dinnerware, exclusively supplying Oneida with the specified product and accepting Oneida's payment, during the course of their business relationship.  Tr. 140:9-141:11; PTX 53.

73.      Tablewerks repeatedly assured Oneida that each and every product it supplied Oneida, including all SANT' ANDREA® dinnerware, was Oneida's exclusive product in North America and would not be made available to any other company.  Tr. 146:24-147:2, 147:14-22, 153:18-23, 154:12-155:2, 157:9-158:13, 591:17-592:4; PTX 3, PTX 50, PTX 51, PTX 119.

74.      Oneida relied upon Tablewerks' repeated guarantees that Oneida was and would remain the exclusive North American distributor of SANT' ANDREA® dinnerware. *Supra* ¶ 73.

75.      Since its beginning, Tablewerks' business practice has always been to enter into exclusive distribution arrangements with each of its customers.  Tr. 528:10-16, 591:17-592:4.

**H.     Defendants Repudiated Their Exclusivity Obligations Owed to Oneida**

76.      Steelite acquired substantially all of Tablewerks' assets as part of a December 12, 2016 transaction ("Transaction").  Tr. 410:25-412:10.

77.      Erwin was designated President of Steelite Distribution LLC, a Steelite International affiliate formed in connection with the Transaction.  DX E.

78.      Steelite has retained Tablewerks personnel, including Shannon Backhaus (former Tablewerks Vice President of Operations) and Richard Erwin (former Tablewerks President) as

- 12 -

paid consultants of Steelite.  Tr. 486:24-487:5, 598:23-599:3.

79.    Erwin continues to receive $200,000 a year, payable monthly, in addition to an 8% commission based on Steelite's continued sales of Royal Porcelain-manufactured products from Steelite.  Tr. 449:6-450:11, 486:24-487:5, 488:1-5.

80.    Tablewerks ceased ordinary business operations following the Transaction. Tr. 599:6-9.

81.    Prior to the Transaction, Tablewerks had an obligation to pay royalty fees to Queensberry Hunt.  After the Transaction, Steelite assumed Tablewerks' obligation of paying royalties to Queensberry Hunt.  Tr. 487:9-13, 796:6-25, 797:5-15.

82.    Prior to the Transaction, Tablewerks had an obligation to place minimum sales orders to Royal Porcelain.  After the Transaction, Steelite assumed Tablewerks' obligation of placing minimum sales orders to Royal Porcelain.  Tr. 488:6-11.

83.    Shannon Backhaus, former Tablewerks Vice President of Operations, has been conducting business on behalf of Steelite using a Steelite email address.  Tr. 488:20-489:7; PTX 55, PTX 56.

84.    Steelite Distribution operates in the same physical location in which Tablewerks operated before the Transaction; uses the same telephone number that Tablewerks used before the Transaction; and uses substantially the same business forms that Tablewerks used before the Transaction.  Tr. 489:15-23, 491:1-8; PTX 55, PTX 56, PTX 58.

85.    As a result of the Transaction, Steelite is continuing Tablewerks' general business operation by functioning as the exclusive United States distributor for products manufactured by Royal Porcelain.  Tr. 411:16-412:2; DX V ("Miles Decl.") ¶ 7; PTX 55, PTX 56, PTX 58.

86.    Steelite and Tablewerks are violating the exclusivity obligations of the Vendor

Agreement by self-distributing the dinnerware designs Royal Porcelain manufactures for Oneida to compete with Oneida.  *Supra* ¶¶ 50-75.

### I.     Oneida Will Suffer Substantially Greater Harm if Defendants' Actions Continue than Defendants Would Suffer if Restrained

87.     If Steelite is able to continue selling products identical to what Oneida has been selling as its SANT' ANDREA® dinnerware, it "truly would have a devastating effect on the business" of Oneida.  Tr. 136:22-138:2.

88.     In just two months, from February-March 2017, Oneida's goodwill and business reputation has suffered so much from Defendants' infringing activities that an estimated $1 million in sales have been lost due to customers declining or retracting orders for SANT' ANDREA® dinnerware.  Tr. 128:6-129:23, 316:24-317:3.

89.     Steelite's actions toward cutting Oneida off from its supply of SANT' ANDREA® dinnerware, self-distributing that dinnerware, and confusing customers about who sells that dinnerware has harmed Oneida's brand and sales such that the harm is difficult to undo with money.  Tr. 316:24-317:3, 337:7-338:6, 338:19-20.

90.     The SANT' ANDREA® dinnerware business at stake is one Oneida built from the ground up through "significant effort" over the course of nearly twenty years; there would not be the demand that there is for the SANT' ANDREA® dinnerware without the approximately $48 million Oneida invested in marketing and promoting the products. Tr. 482:10-23; PTX 61; *supra* ¶¶ 20-31, 36-42.

91.     Steelite did not conduct any of the promotional work or invest any of the money required to introduce the SANT' ANDREA® dinnerware products to the marketplace. Tr. 482:10-23.

92.     Steelite is currently selling dinnerware with the NEXUS™ design outside the

- 14 -

United States. Tr. 498:19-21.

93.     Steelite acquired Tablewerks to prevent Oneida from continuing to sell SANT'

ANDREA® products manufactured by Royal Porcelain. Tr. 523:13-20.

94.     Oneida has posted a $5 million dollar bond as security for injunctive relief

ordered by the Court. DE 36.

## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Oneida Has Satisfied the Preliminary Injunction Standard

95.     A court may issue a preliminary injunction where the moving party demonstrates

"both irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently

serious questions going to the merits making them a fair ground for litigation and a balance of

hardships tipping decidedly in the movant's favor." *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,

808 F. Supp. 952, 957 (E.D.N.Y. 1992).

96.     "[I]rreparable harm would result if plaintiff demonstrates its Lanham Act claim is

likely to succeed." *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d

Cir. 1997). A "loss of client relationships and customer good will built up over the years" can

also "constitute[] irreparable harm for purposes of imposing a preliminary injunction." *Singas*

*Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 468 F. App'x. 43, 46 (2d Cir. 2012).

97.     Defendants' actions are directly and immediately inflicting irreparable harm on

Oneida by destroying the goodwill it has developed in its important SANT' ANDREA®

dinnerware line, specifically with respect to BOTTICELLI® and NEXUS™, as well as the

customer relationships Oneida has fostered in connection with its goodwill. *Supra* ¶¶ 20-31, 36-

65, 87-90.

98.     Oneida is likely to succeed on its Lanham Act claim, unfair competition claims,

and breach of contract claim. But, an even lesser showing is sufficient to grant a preliminary

injunction in light of the sufficiently serious questions going to the merits that have been raised and the tipping of the balance of hardships in Oneida's favor.  *Essie*, 808 F. Supp. at 957.

99.     The balance of hardships tips decidedly in Oneida's favor because if an injunction is not granted Oneida stands to lose all of the goodwill and $48 million it has invested for nearly two decades in developing for its SANT' ANDREA® dinnerware line.  *Supra* ¶¶ 20-31, 36-65, 87-90.  In contrast, Steelite has invested nothing to sell the SANT' ANDREA® patterns.  *Supra* ¶¶ 29, 91-93.  "Defendants took a calculated risk in launching a product with a trade dress virtually identical to the trade dress that was used in the previously licensed line of products.  In doing so, they proceeded at their peril."  *Barefoot Contessa Pantry v. Aqua Star*, No.15-CV-1092, 2015 WL 845711, at *8 (S.D.N.Y. Feb. 26, 2015).

**B.     Oneida Is Likely to Succeed on Its Trade Dress Infringement Claim**

100.     If product trade dress is non-functional and has achieved secondary meaning then it is protectable under the Lanham Act, and it is completely irrelevant whether the trade dress is registered or unregistered.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000); *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.*, 999 F.2d 619, 620 (2d Cir. 1993); *Essie*, 808 F. Supp. at 958-61; 15 U.S.C. 1125(a).

101.     Courts may grant injunctions to prevent a violation of trade dress rights protected by 15 U.S.C. § 1125 (false designation of origin). 15 U.S.C. § 1116(a).

102.     Oneida's BOTTICELLI® and NEXUS™ dinnerware designs are non-functional, protectable trade dress.  Hoffman Decl.¶ 10; *supra* ¶¶ 14, 17.  *Villeroy,* 999 F.2d at 620 (holding that hotel china can be protectable trade dress); Restatement (Third) of Unfair Competition, § 17 Functional Designs, Illustration No. 6.

103.     Oneida's BOTTICELLI® and NEXUS™ dinnerware designs have acquired secondary meaning because, for over a decade, those product designs have been consistently and

prominently marketed and sold exclusively by Oneida to the point that they have become symbols of Oneida in the foodservice dinnerware marketplace.  *Supra* ¶¶ 22-31, 36-49.  *Wal-Mart*, 529 U.S. at 212 ("'over time, customers may come to treat a particular [design] … as signifying a brand' … [and] could be protected upon a showing of secondary meaning") (emphasis omitted); *Christian Louboutin S.A. v. Yves Saint Laurent Am.*, 696 F.3d 206, 226 (2d Cir. 2012) ("We see no reason why a ... mark… could not acquire secondary meaning—and therefore serve as a brand or source identifier—if it is used so consistently and prominently by a particular designer that it becomes a symbol…")

104.    Oneida has proven its BOTTICELLI® and NEXUS™ dinnerware designs have achieved secondary meaning in the form of (1) advertising expenditures; (2) consumer commentary linking the BOTTICELLI® and NEXUS™ trade dress to Oneida; (3) unsolicited media coverage of the BOTTICELLI® and NEXUS™ dinnerware designs; (4) sales success of the BOTTICELLI® and NEXUS™ dinnerware; (5) attempts to plagiarize the BOTTICELLI® and NEXUS™ trade dress; and (6) length and exclusivity of the BOTTICELLI® and NEXUS™ trade dress's use.  *Supra* ¶¶ 20-39, 42, 50-65.  *Essie*, 808 F. Supp. at 958.

105.    Defendants' knowing adoption of dinnerware designs *exactly identical* to Oneida's BOTTICELLI® and NEXUS™ trade dress, compounded by the intention to sell to the exact customers to whom Oneida was selling the dinnerware, is evidence of a bad faith intent to capitalize on Oneida's reputation and goodwill.  *Supra* ¶¶ 50-65.  This evidence of bad faith copying is, in and of itself, evidence of secondary meaning.  *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243, 248 (S.D.N.Y. 2004); *Essie*, 808 F. Supp. at 959-960.

106.    The fact that customers associate the BOTTICELLI® and NEXUS™ dinnerware trade dress with a single source means the trade dress has achieved secondary meaning.  *Supra*

- 17 -

¶¶ 20-39, 42.  *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) *overruled on other grounds by Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993).

### 1.    Oneida Owns the BOTTICELLI® and NEXUS™ Trade Dress

107.    Oneida owns the trade dress rights in the BOTTICELLI® and NEXUS™ products because it is the entity "who first used it commercially and acquired superior rights to it." *Supra* ¶¶ 20-39, 42.  *Tactica Int'l v. Atl. Horizon Int'l*, 154 F. Supp.2d 586, 599 (S.D.N.Y. 2001).  Neither Royal Porcelain nor Tablewerks used or sold the products in commerce because neither entity "ma[de] the goods available to the purchasing public." *Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985).  Royal Porcelain and Tablewerks merely carried out delivery of the goods to the trade dress claimant from the manufacturer.  That is, it was a shipment of the goods in preparation for offering the goods for sale.  They did not make the goods available to the purchasing public, as would be required to establish trade dress rights.  *See id.*  This alleged "use" by Royal Porcelain and Tablewerks does not constitute a "use in commerce" necessary for trademark ownership.

108.    There can be no doubt that the consuming public understands Oneida, rather than the remote Thai factory/manufacturer Royal Porcelain, is the entity that stands behind BOTTICELLI® and NEXUS™ dinnerware.  "[W]hen goods pass through the distributor's hands in the course of trade and the distributor gives them the benefit of its reputation or of its name and business style," the distributor owns the trade dress rights in those goods.  *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 111-12 (E.D.N.Y. 2012).  Courts consider five factors when determining whether a distributor owns a product's trade dress:

> (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; (4) with which party the public identified the product and to whom

purchasers made complaints; and (5) which party possesses the goodwill associated with the product, or which party the public believes stands behind the product.

*Id.*; *Barefoot Contessa*, 2015 WL 845711, at *3.

109.    Oneida owns the BOTTICELLI® and NEXUS™ trade dress because each of these five factors weigh in its favor:

(1) Oneida is the first and only party to have used the BOTTICELLI® and NEXUS™ trade dress in commerce in a manner recognized by federal trademark laws.  *Supra* ¶¶ 20-39, 42.  *Avakoff*, 765 F.2d at 1098.

(2) Oneida's name is the only entity name that appears alongside the BOTTICELLI® and NEXUS™ trade dress promotional materials in the marketplace.  *Supra* ¶¶ 20-42.  To the extent the words "Royal Porcelain" appear on any SANT' ANDREA® product, they are indicative only of the product material, not source.  Tr. 608:23-609:18; PTX 78 (stamp reads "Royal Bone China," not "Royal Porcelain," because the material is not porcelain).  Furthermore, customers do not pay attention to what is on the backstamp of a plate.  *Supra* ¶ 40.

(3) Oneida is the only party to monitor product quality in the marketplace and respond to quality concerns from customers to ensure the quality of BOTTICELLI® and NEXUS™ goods.  *Supra* ¶¶ 44-49.  *Haggar*, 906 F. Supp. 2d at 122-24.

(4) The public recognizes BOTTICELLI® and NEXUS™ dinnerware as Oneida products, and directs inquiries related to those products to Oneida.  *Supra* ¶¶ 20-49.

(5) For over a decade, the BOTTICELLI® and NEXUS™ has been associated with only one commercial source—Oneida.  *Supra* ¶¶ 20-49, 90.  When the public wants to purchase a BOTTICELLI® or NEXUS™ product or make a quality-related inquiry about the products,

- 19 -

it brings that request to Oneida. *Supra* ¶¶ 37-49. Neither Royal Porcelain nor Tablewerks interacts with the purchasing public in connection with BOTTICELLI® or NEXUS™ products. *Supra* ¶¶ 37-49. *Tactica*, 154 F. Supp. 2d at 601 ("If the public believes that the exclusive distributor is responsible for the product, so that the trademark has come, by public understanding, to indicate that the goods bearing the trade-mark come from plaintiff although not made by it … that is proof that [it] possesses the goodwill associated with the product.")

> **2.     There Is at Least a "Likelihood of Confusion" Between Oneida's SANT' ANDREA® Products and Steelite's Infringing Products**

110.    Because Defendants have intentionally chosen to sell products bearing a design identical to Oneida's trade dress, a "likelihood of confusion" is presumed. *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 496-97 (S.D.N.Y. 2015); *Dunkin' Donuts Inc. v. N. Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 40 (E.D.N.Y. 2001) ("when the infringer uses the exact [trade dress] as the plaintiff … likelihood of confusion is inevitable. … Such cases are 'open and shut.'") (quoting *McCarthy, Trademarks and Unfair Competition*).

111.    In addition to the presumption of confusion, consideration of the traditional *Polaroid* factors also demonstrates a likelihood of confusion between Defendants' infringing products and Oneida's trade dress: (1) Oneida's BOTTICELLI® and NEXUS™ trade dress are strong (*supra* ¶¶ 20-39, 42); (2) the appearance of Oneida's and Defendants' products are not just similar, they are identical (*supra* ¶¶ 50-62); (3) and (4) the products are in the same market space and directed at the same customers and thus there is no gap to bridge (*supra* ¶¶ 50-62); (5) consumer reports indicate that actual confusion is inevitable, and indeed already occurring, because Defendants' products are identical to Oneida's well-known products (*supra* ¶¶ 50-62); (6) and (7) the sophistication of the customers and quality of the products are immaterial because

- 20 -

Defendants are using Oneida's exact design (*supra* ¶¶ 50-62); and (8) Defendants have acted in bad faith by intentionally copying Oneida's trade dress to capitalize on the reputation and goodwill that Oneida established.  *Supra* ¶¶ 57-62.  *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F. Supp. 394, 409, 413 (S.D.N.Y. 1989) ("when the products have a virtually identical design, as here, '[t]he sophistication of the consumers cannot be relied upon to prevent confusion.'")

112.    Defendants' labels on their infringing products will not reduce customer confusion.  *Supra* ¶ 40, 109.  Because the products are "essentially labelless, at first glance, since the label is on the bottom…. There is a substantial probability that a purchaser would not notice defendant's [label] … without careful inspection…"  *Essie*, 808 F. Supp. at 959-60.

### 3.    Defendants' Purported Intellectual Property Rights Are Extremely Narrow and Legally Irrelevant

113.    Defendants' design patent D481,261, which expires on October 28, 2017, does not give Defendants the right to sell products that infringe Oneida's BOTTICELLI® trade dress for at least four separate reasons: (1) the patent expressly states that "the top part of the plate forms no part of the claimed design," and thus does not relate to the design of Oneida's BOTTICELLI® trade dress (DX A); (2) the patent is invalid because the patent's only claimed features, the ridges on the bottom of the plate, are intended to serve the functional and non-ornamental purpose of facilitating handling (DX T ("Queensberry Decl.") at ¶ 3); *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed. Cir. 1986); (3) a patent right is only a right to exclude others from making, using, offering, importing, or selling the invention, and does not guarantee a right to practice the invention (35 U.S.C. § 154); and (4) a grant under patent law is not a permit to violate other law by infringing another's trade dress rights, which serve a different function than, and may co-exist with, patent rights (*Lon Tai Shing Co., Ltd. v.*

*Koch + Lowy*, No. 90-CV-4464 (DNE), 1991 WL 170734, at *38 (S.D.N.Y. June 20, 1991) ("[I]f a patented product operates to deceive or confuse consumers as to its source or sponsorship, there is no reason why the patent holder cannot be enjoined from such deception or confusion.").)

114.    To the extent that some aspect of BOTTICELLI® and NEXUS™ dinnerware designs are copyrightable, which they have not yet been shown to be, "a valid copyright does not entitle the copyright holder to infringe another's trade dress rights." *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 983 (N.D. Cal. 2006).

**C.    Steelite, the "Second Comer," Is Committing Common Law Unfair Competition by Misappropriating Oneida Property and Taking Advantage of Customer Confusion to Capitalize on Oneida's Goodwill**

115.    "The essence of unfair competition under New York law is the bad faith misappropriation of the labors and expenditures of another." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 222-23 (S.D.N.Y. 2013); *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193, 208-10 (S.D.N.Y. 2014).

116.    Defendants are committing unfair competition by (1) misappropriating the substantial labors and expenditures made by Oneida in developing the entire SANT' ANDREA® dinnerware line in the foodservice marketplace over the course of twenty years, and (2) misappropriating the approximately $380,000 worth of tooling purchased and owned by Oneida, without Oneida's authorization or consent, to manufacture and sell products in competition with Oneida. *Supra* ¶¶ 7, 10-13, 18, 20-31, 36-65, 90.

117.    Defendants' plan to sell Oneida's exact same products, to Oneida's exact same customers, made using Oneida's exact same equipment evidences their bad faith intent to capitalize on the reputation, goodwill, and competitive advantage of Oneida. *See Cartier*, 348 F.

Supp. 2d at 248, 251.

118.    Defendants are also committing common law trade dress infringement across all of Oneida's SANT' ANDREA® dinnerware lines by intentionally selling products that are confusingly similar to Oneida's dinnerware.  Unlike with the Lanham Act, secondary meaning is not required to establish trade dress infringement under New York common law.  *Cartier*, 348 F. Supp. 2d at 250-51; *Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*, 530 F. Supp. 375, 379 (S.D.N.Y. 1981) ("it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a second comer is confusingly similar to its own.")

119.    "To succeed on [its] claim, plaintiff[] must show a likelihood of confusion and bad faith."  *Cartier*, 348 F. Supp. 2d at 243, 251.  Defendants' intentional adoption of the exact same designs historically sold by Oneida as its SANT' ANDREA® products is evidence that Defendants' products are confusingly similar to Oneida's SANT' ANDREA® products.  *Supra* ¶¶ 58-65.  *Perfect Fit Indus. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980).

120.    Defendants' intentional adoption of the exact SANT' ANDREA® designs previously sold by Oneida and their sale of those designs to the same customers Oneida is selling to demonstrates their intent to capitalize on Oneida's reputation and goodwill.  *Supra* ¶¶ 58-65. This is evidence of bad faith.  *See Cartier*, 348 F. Supp. 2d at 248, 251.

### D.    Steelite and Tablewerks Have Repudiated Their Exclusivity Obligations to Oneida

121.    "He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contract party, is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *Nardi v. Povich*, 824 N.Y.S.2d 764, 764 (Sup. Ct. 2006).

122.     The "Procurement Terms and Conditions" section in Oneida's Vendor Agreement describes the exclusivity obligations Tablewerks owed to Oneida.  *Supra ¶ 66-69*.  Richard Erwin, on behalf of Tablewerks, assented to these exclusivity obligations in writing by signing and returning the Vendor Agreement.  *Supra ¶¶ 70*.  Tablewerks' twenty-year long adherence to and recognition of these obligations confirmed its intent to be bound by the Vendor Agreement. *Supra ¶¶ 71-75*.

123.     Even assuming *arguendo* that Tablewerks did not sign the Vendor Agreement, Tablewerks nevertheless agreed to be bound by its terms according to page 3 of the Vendor Agreement by supplying dinnerware to Oneida under Oneida purchase orders for nearly twenty years.  *Supra ¶¶ 71-75*.

124.     Defendants have breached the exclusivity obligations of the Vendor Agreement. *Supra ¶¶ 50-75*.

125.     Defendants' contract breach has damaged Oneida's goodwill and reputation by creating confusion among former customers, jeopardizing the customer relationships Oneida has forged over nearly two decades, and simultaneously exploiting the goodwill and competitive advantage belonging to Oneida through its labors in creating a market for the SANT' ANDREA® dinnerware.  *Supra ¶¶ 56-55, 87-93*.  *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013).

126.     In the alternative, Defendants are bound by Tablewerks' repeated and unequivocal promises and well-known marketing policy spanning twenty years that the SANT' ANDREA® dinnerware designs were Oneida exclusive products under the doctrine of promissory estoppel.  *Supra ¶¶ 71-75*.  *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir. 1986).

- 24 -

1.     **Steelite Is Tablewerks' Successor-in-Interest Because the Acquisition Was in Substance a *De Facto* Merger**

127.     A corporation that "seek[s] to obtain for itself intangible assets such as good will, trademarks, patents, customer lists and the right to use the acquired corporation's name…effectively takes over a company in its entirety [and] should carry the predecessor's liabilities..." under a theory of *de facto* merger. *Fitzgerald v. Fahnestock & Co.*, 730 N.Y.S.2d 70, 71-72 (App. Div. 1st Dep't 2001).

128.     Steelite's acquisition of Tablewerks is a *de facto* merger and Steelite is liable for Tablewerks' contractual obligations. *Id.*; *see also Arrowhead Capital Fin., Ltd. v. Seven Arts Entm't, Inc.*, No. 14-Civ.-6512, 2016 WL 4991623 at *13 (S.D.N.Y. Sept. 16, 2016).

129.     The first *de facto* merger factor, continuity of ownership, is satisfied because Tablewerks' President, Richard Erwin, is still benefiting from a commission on Tablewerks' sold assets and is being retained as a paid consultant by Steelite. *Supra* ¶¶ 76-79. *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 214 n.5 (2d Cir. 2006) (recognizing that agreement to "retain the president of the seller corporation as a consultant and to pay a $60,000 annual consulting fee" may constitute "indicia of control over or continuing benefit from the sold assets … sufficient to satisfy the continuity of ownership factor"); *see also Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 94–95 (S.D.N.Y. 2002), *aff'd*, 352 F.3d 41 (2d Cir. 2003).

130.     The remaining *de facto* merger factors are all present and weigh in favor of successor liability, as well, because Tablewerks' has ceased operations; Steelite has assumed Tablewerks' liabilities necessary for the uninterrupted continuation of Tablewerks' business; and there is a continuity of management, personnel, physical location, assets, and general business operation between Tablewerks and Steelite. *Supra* ¶¶ 76-85. *Ortiz v. Green Bull, Inc.*, No. 10-CV-3747 ADS ETB, 2011 WL 5554522, at *6 (E.D.N.Y. Nov. 14, 2011).

Dated:   April 28, 2017                Respectfully submitted,

                                       MILBANK, TWEED, HADLEY & MCCLOY LLP


                                       By:   */s/ Christopher J. Gaspar*
                                       Mark C. Scarsi
                                       Ashlee Lin (*pro hac vice* admission pending)
                                       MILBANK, TWEED, HADLEY & MCCLOY LLP
                                       2029 Century Park East – 33rd Floor
                                       Los Angeles, CA 90067
                                       (424) 386-4000

                                       Christopher J. Gaspar
                                       Nathaniel Browand
                                       Sean Hyberg
                                       MILBANK, TWEED, HADLEY & MCCLOY LLP
                                       28 Liberty Street
                                       New York, NY 10005
                                       (212) 530-5000

                                       Kristin L. Yohannan
                                       MILBANK, TWEED, HADLEY & MCCLOY LLP
                                       1850 K Street, NW, Suite 1100
                                       Washington, D.C. 20006
                                       (202) 835-7500

                                       *Attorneys for Plaintiff*
                                       *The Oneida Group Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing *Plaintiff The Oneida Group Inc.'s Proposed Findings of Fact and Conclusions of Law* was electronically filed on April 28, 2017.  Notice of this filing will be sent to all parties by operation of the Court's CM/ECF system.


 */s/ Nathaniel Browand*
Nathaniel Browand