UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
THE ONEIDA GROUP INC.,

                        Plaintiff,

                - against -

STEELITE INTERNATIONAL U.S.A. INC.,
TABLEWERKS INC., RICHARD ERWIN, STEVEN
LEFKOWITZ and ANTHONY DELOSREYES,

                    Defendants.

-----------------------------------------------------------------------x

FILED
CLERK

11:11 am, May 10, 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM OF
DECISION AND ORDER**
17-cv-0957 (ADS)(AKT)

**APPEARANCES:**
**Milbank Tweed Hadley & McCloy, LLP**
*Attorneys for the Plaintiff*
28 Liberty Street
New York, NY 10005
       By:    Christopher J. Gaspar, Esq.,
                Mark C. Scarsi, Esq.,
                Ashlee Lin, Esq.,
                Kristin L. Yohannan, Esq.,
                Ryan N. Hagglund, Esq.,
                Nathaniel T. Browand, Esq., of Counsel

**Gordon & Rees LLP**
*Attorneys for the Defendants Steelite International U.S.A., Inc., Steven Lefkowitz, and Anthony*
*DeLosReyes*
1300 I Street, NW
Washington, DC 20005
       By:    Howard Shipley, Esq.
                John G. Ebken, Esq.,
                Thomas L. Allen, Esq.,
                Paul Eastgate, Esq.,
                Peter G. Siachos, Esq., of Counsel

**Moses & Singer**
*Attorneys for the Defendants Tablewerks, Inc., and Richard Erwin*
405 Lexington Avenue
New York, NY 10174
        By:    David M. Rabinowitz, Esq.,
               Shari Ann Alexander, Esq., Of Counsel

**SPATT, District Judge:**

This action centers on whether certain dishes obtained trade dress protections under the Lanham Act or New York State law, and whether two parties ever entered into an exclusive distribution contract for those dishes.

The Plaintiff Oneida Group, Inc. (the "Plaintiff" or "Oneida") brought this action against the Defendants Steelite International U.S.A. Inc. ("Steelite"), Tablewerks Inc. ("Tablewerks"), Richard Erwin ("Erwin"), Steven Lefkowitz ("Lefkowitz"), and Anthony DeLosReyes ("DeLosReyes") (collectively, the "Defendants"). Oneida sought damages and injunctive relief, alleging trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a) and New York common law; unfair competition under New York common law; trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; New York state common law pertaining to misappropriation of trade secrets; Ohio state laws pertaining to misappropriation of trade secrets, Ohio Rev. Code § 1333.61 *et seq.*; breach of contract, and tortious interference with business relations.

Oneida initially moved for a temporary restraining order, a preliminary injunction, and expedited discovery. The Court referred Oneida's motion to Magistrate Judge A. Kathleen Tomlinson for a report and recommendation (an "R&R"). Judge Tomlinson did an outstanding job under these very expeditious circumstances. On February 28, 2017, Judge Tomlinson issued

an R&R recommending that the Court issue a temporary restraining order pending resolution of Oneida's motion for a preliminary injunction. Judge Tomlinson followed up her initial R&R with a full written opinion on March 14, 2017. Following that ruling, the Court held a five day hearing from April 10, 2017 through April 14, 2017 to resolve Oneida's motion for a preliminary injunction.

This decision is rendered following a five day preliminary injunction hearing, and the benefit of multiple memoranda from each party. For the following reasons, Oneida's motion for a preliminary injunction is denied; the temporary restraining order is vacated; and Oneida's motion for expedited discovery is granted.

## I.  THE HEARING

The Court will not engage in a detailed recitation of all of the evidence presented over the course of the five day hearing. Knowledge of the underlying facts is presumed. The Court notes that the hearing transcript ("Tr.") spans over nine hundred pages, and dozens of exhibits were entered into evidence. However, for the purposes of the instant motion, the Court will review the relevant portions of the testimony presented during the hearing.

**A.  The Plaintiff's Case**

### 1.  Corrie Byron

Corrie Byron ("Byron") is the President of Food Service and International at Oneida. Byron testified that Oneida has been in business for over a century. It sells tabletop products, including dinnerware, drinkware, flatware and banquetware. As to dinnerware, one of its most promoted lines is the Sant' Andrea line including the Botticelli design and the Nexus design. Byron leads a team of approximately twenty-six sales persons.

3

The Court notes that later testimony revealed that these plates are manufactured by Royal Porcelain in Thailand. Royal Porcelain makes the plates and sells them to Tablewerks. Oneida would place orders for the Sant' Andrea dishes with Tablewerks, and Tablewerks sold the dishes to Oneida.

Byron testified that customers recognize these two plates by the patterns on the plates. The plates are premier dinnerware and considered to be luxury brands. The customers of the Oneida Sant' Andrea line are hotels, cruise lines and fine dining establishments, including Royal Caribbean Cruise Line, Hilton hotels, Hyatt Hotels, and Garden Bringer. The plates are primarily not sold directly to the customers by Oneida. The plates are typically sold by Oneida through dealers and distributors, but in some situations, Oneida will sell directly to an end user.

Byron testified that she has been in personal contact with most of these ultimate customers, and that there is a lot of confusion in the market due to the current situation. There are twenty-six members in Oneida's sales team and fifteen people are in the Sant' Andrea products group.

Botticelli is the number one product in Oneida's sales. The Botticelli pattern was launched in the market fifteen or sixteen years ago. It is its largest product and it consummates eight million dollars in Oneida's total sales of sixteen million dollars. The Oneida sales for fiscal year 2014 was $16,175,000 and $16.6 million for the year 2015. In 2016, the Sant' Andrea dinnerware represented close to 15% of the total Oneida food service sales.

Also introduced in evidence was the Oneida Food Service Cost Structure (Pl.'s Ex. 61). The investment in the Sant' Andrea line was approximately $48 million dollars over a period of nineteen years. The average annual investment was in excess of $2.5 million dollars.

4

In 2016, Oneida paid $2,109,715 in commissions. This money is paid to sales agents as commissions to promote Oneida's products. The Sant' Andrea products represent 16% of the Oneida total food service sales. In addition to dinnerware, Oneida also supplies knives, forks, spoons, glassware and banquetware. However, the sale of dinnerware drives the sales of other food service products. Oneida had investments of approximately $1,380,000 with Royal Porcelain, the manufacturer of the Sant' Andrea products, for tooling costs.

Also, Oneida furnishes dinnerware catalogs to explain its line and promote sales of its products. Oneida printed these catalogs every year for the last nineteen years. The catalogs include the Botticelli dinnerware. Oneida also issues printed sales promotional material for a television line. The Sant' Andrea Botticelli dinnerware won an award in February 2014. In addition, another award was given to the Sant' Andrea Botticelli design from the Club and Resort Company.

On December 13, 2016, Byron received a letter from Steelite related to its acquisition of Tablewerks. (Pl.'s Ex. 2). The letter stated that:

> Steelite [had] acquired substantially all assets, intellectual property, and other rights of Tablewerks . . . . Please be advised that . . . Steelite intends to self-distribute all product produced by Royal Porcelain under the Royal Porcelain back-stamp. While we are advised that there is no contractual relationship between [Oneida] and/or its affiliates [], on the one hand, and Tablewerks and/or Royal Porcelain on the other, in an effort to facilitate a seamless transition, Steelite is prepared to accommodate [Oneida] . . . .

(*Id.*) Steelite's CEO went on to say that Steelite would fulfill all existing purchase orders, and honor the current pricing terms, not object to Oneida's sale of its current Royal Porcelain inventory; respect Oneida's intellectual property such as the "Sant' Andrea" name and back-stamp; and asked that Oneida similarly honor Steelite's intellectual property. (*Id.*). The letter ended by stating that Steelite was "open to any dialogue concerning the [matter] . . . ." (*Id.*).

This was a "shock" to Byron.  Within twenty-four hours of the receipt of this letter, Oneida started receiving customer questions and experienced customer confusion.  In response, Byron sent an e-mail to Oneida's dealers, distributors and end users.  (Defs.' Ex. G).  In this communication to its customers, Oneida advised them that Tablewerks had been purchased by "another smaller supplier," but that "[e]ven prior to this event, Oneida had been working on a transition of both design and manufacturing capability due to what we saw as the diminished innovation and protected design portfolio being offered."  (*Id.*).  Byron described a "very minor adjustment to our supply chain . . . with zero disruption to product or services . . . ."  (*Id.*).

After the Steelite December 13, 2016 letter, in February and March 2017, Oneida's sales decreased over one million dollars.  After the issuance of the Temporary Restraining Order, some sales have come back, but overall, Oneida sales are still down.

Oneida attended a NAFEM trade show (the "trade show") from February 9, 2017 to February 11, 2017, in Miami, Florida,.  At the trade show, Steelite had a booth and presented the full line of Sant' Andrea products, with a place card that stated "supply will be available in Spring."

Byron was questioned as to the effect on Oneida's business if Steelite is able to sell these Sant' Andrea products made by Royal Porcelain as Steelite's own products.  Byron responded:

> A.      I believe this truly would have a devastating effect on the business.  This dinnerware is the leading category, in importance, to our customers.  The Sant' Andrea one is the most prominent brand and luxury line.  If that were compromised, the rest of the categories and brands that we sell will be at risk.
> Q.      Would you describe this as a major impact?  Or some other type of impact; minor impact?
> A.      Oh, truly a devastating impact.  It's a very serious business issue, which is why we reallocated all of our business resources.
> Q.      Has it been a disruption to Oneida's business since mid-December?
> A.      Absolutely.   In nearly every way possible.   Every function has been impacted.

Q.      Which functions do you mean?
A.      Sales team, redirecting our time, customer service calls, product supply focused on finding a new alternative of supply that we thought was a staple part of our business.   The entire leadership team has actually gone off the other two businesses to focus solely on food service for a vast majority of their projects.

(Tr. at 137–38).

Byron reiterated that Oneida ordered its products through Tablewerks who had a relationship with Royal Porcelain, the manufacturer.  Never before has Oneida had a one million dollar drop off in sales of Sant' Andrea products.  Oneida had a mutually exclusive relationship with Tablewerks for nineteen years.

On cross-examination, Byron testified that she started working for Oneida in July 2016. Previously, she worked for a food service business which didn't involve dinnerware.  After receipt of the Steelite letter, there was dialogue between Oneida and Steelite and a mediation in an attempt to resolve their problem.  Also, Steelite continued to supply products to Oneida for a short period of time.

It was brought out that the Oneida sales of Sant' Andrea products prior to the Steelite takeover were $17.7 million in 2012; $16.9 million in 2013; and $15.2 million in 2014.  Further, even prior to the Steelite letter, Oneida was investigating the development of a product similar to Botticelli but at a lower cost, and from an alternative manufacturer in China.  Oneida had been in contact with Royal Caribbean Cruise Line about supplying the cruise line with those "Botticelli-like" products.  Oneida has received one or two samples of this new product, and the project is still ongoing.  After Byron received the Steelite letter, another group at Oneida began investigating potential alternative sources of supply.

Byron was also asked about Oneida's purported "contract" with Tablewerks. It was brought out that the only signature on Plaintiff's Exhibit 6 entitled "Business Requirements For All Vendors Of Oneida," is on a page captioned "Code of Conduct." There is no signature by Tablewerks on the page captioned "Vendor/Supplier Acknowledgment Form." The document further stated that "if a vendor fails to sign and return these forms, they (Oneida) will not continue doing business with Oneida Limited." These were two different forms.

Steelite has continued to supply products to Oneida. At the time of the acquisition, Oneida's Sant' Andrea inventory was expected to last two to five months.

### 2. Daniel Hoffman

Portions of the video deposition testimony of Daniel Hoffman ("Hoffman") were read into the record. Hoffman started working for Marriott International in 1997 and is still an employee of that organization. He is the Director of the Food and Beverage Program and oversees sixteen hotels. Hoffman works with contractors and vendors. Hoffman testified that Marriot began purchasing Botticelli in 2001, and began purchasing Nexus in 2009. In his opinion, both products are unique, recognizable and immensely popular. Although Hoffman believed that the Botticelli design is distinctive, he admitted that it was similar in some ways to a product offered by Tuxton, a competitor of Oneida.

Hoffman had stated in his original declaration, that was submitted to the Court in support of Oneida's motion and relied upon by Judge Tomlinson, that Botticelli and Nexus were "synonymous" with Oneida. However, in his deposition, Hoffman amended his declaration to say that Botticelli and Nexus are "marketed by" Oneida. (Tr. at 258).

### 3.  Paul Gebhardt

Paul Gebhardt ("Gebhardt") also testified by deposition.  He is presently employed by Oneida, which was founded in 1850 and incorporated in 1980.  From 2003, Gebhardt was the Oneida Senior Vice President of Design and Advertising.

Gebhardt testified that Oneida owns the Sant' Andrea trademark, and that Queensberry Hunt designed the Botticelli and Nexus patterns.  However, Gebhardt said that Oneida had collaborated on the designs.

### B.  The Defendants' Case

### 1.  John Miles

John Miles ("Miles") is the CEO of Steelite.  He has been an employee of Steelite since November 1996.  Miles held various positions with the company and became CEO in June 2016. Steelite is an international manufacturer, designer and producer of tableware products and trades actively in one hundred forty countries.  The company, in the tableware industry and food service business, sells to hotels and restaurants.  Steelite believes transparency in manufacturing is imperative with regard to the identity of a product's manufacturer, namely, to tell customers where the item is manufactured.  Miles said that is why Steelite purchases products directly from manufacturers.

Miles also testified that Royal Porcelain was founded thirty-five years ago, based in Thailand, about sixty-three miles north of Bangkok, employs almost a thousand people, and is the preeminent manufacturer of porcelain products and especially food service products.  Tablewerks was also the sole importer and distributor of Royal Porcelain food service products in the United

States.  Steelite is an exclusive distributor for several other factories, so that Tablewerks and Steelite were competitors.

Introduced into evidence were two United States Design Patents for Botticelli with the inventors listed as David Queensberry ("Queensberry"), Martin Hunt and John Horler—who are all members of the Queensberry Hunt design team.  Both patents were assigned to Tablewerks by an agreement with Queensberry Hunt.  One of the patents expired during Steelite's due diligence.  There are also pending copyright applications for the designs that Oneida marketed as Botticelli and Nexus.

In the summer of 2016, Steelite acquired all the assets of Tablewerks for the sum of $10 million dollars, including the exclusive distribution rights of Tablewerks in the United States.  There was also a distribution license between Steelite and Royal Porcelain in which Steelite acquired the exclusive distribution rights for all Royal Porcelain products in the United States relating to the food service business.  There was a transfer of the intellectual property in "Belisa," which Oneida had marketed as Botticelli, from Tablewerks to Steelite.  Based on these two patents and the agreements, Miles stated that Steelite acquired all the intellectual property rights held by Tablewerks.  Miles stated that going forward, "Steelite" and "Royal Porcelain" would be stamped on the dishes and packages of the products previously known as Botticelli and Nexus.

On December 13, 2016, the day after its acquisition of Tablewerks was completed, Steelite informed Oneida by letter of its purchase of Tablewerks and advised Oneida that it was open to any dialogue concerning this matter.  Further, Steelite agreed not to use Oneida's trade names and also agreed not to show Oneida's former products before the NRA show in May 2017.

Thereafter, Steelite supplied three months of product to Oneida.  Steelite initially sold to Oneida $550,000 worth of product and additional orders for $650,000, $38,000, $20,000 and one small order.  Also, after this law suit commenced, Oneida placed additional orders and Steelite filled them.  As a result of this litigation, Steelite has not attempted to sell its products to any company other than Oneida.

Steelite avers that is has been unable to sell and distribute Royal Porcelain products, for which it paid $10 million dollars to acquire distribution rights.

On cross-examination, Miles testified that the actual purchase price of Tablewerks was more than $12 million dollars.  Steelite doesn't typically register trade dress or file copyright applications for its products.

In the future, Steelite intends to sell the Botticelli product as Belisa, and the Nexus product as Vortex, to prior Oneida customers.  Steelite has already contacted those customers.  However, its operation has been barred by the provisions of the Temporary Restraining Order dated March 14, 2017.

In a Distribution and License Agreement, in evidence as Defs.' Ex. JJ, Royal Porcelain represents that it has trade dress rights to its products which it assigned to Steelite.

**2.  Richard Erwin**

Richard Erwin ("Erwin") was the founder and sole owner of Tablewerks.  The company known as Tablewerks is no longer in existence as a result of the sale to Steelite, but it survived the acquisition as a company called North Rock Trading Company, Inc.  Erwin claims that he currently has no interest in Steelite, but Steelite does pay him a $200,000 annual consulting fee.

Erwin testified that Tablewerks and Royal Porcelain had a written contract, and that all of the Tablewerks products were purchased from Royal Porcelain under the terms of that contract. Royal Porcelain places its name on all the dinnerware it distributed in North America, including Botticelli.

Erwin reiterated that Tablewerks obtained design patents in the Botticelli shape.  When Oneida wanted Botticelli plates, it placed orders with Tablewerks.  Erwin stated that there was never any contractual agreements between Tablewerks and Oneida, and that Tablewerks could sell to customers other than Oneida at any time.

Erwin testified that he had been looking for someone to purchase Tablewerks for some time, and that he had spoken with Miles for years about Steelite purchasing Tablewerks.  He did not consider Oneida as a possible suitor because Tablewerks was concerned about the financial viability of Oneida.  Apparently, Oneida had gone through two bankruptcy filings in 2006 and 2015.  After the 2015 reorganization, Tablewerks imposed a credit limit on receivables from Oneida and it has met those payment terms.  However, in the period between 2006 and 2015, there were multiple years of delinquent payments by Oneida.  Recently, Tablewerks perceived that Oneida may be experiencing financial problems again.

On cross examination, Erwin was asked about Tablewerks' purported contract with Oneida.  (Pl.'s Ex. 6).  Erwin testified that he signed page four of the document, entitled "Code of Conduct," on behalf of Tablewerks.  Page three of the document states that the terms and conditions shall apply to all order for goods.  It further states that "your failure to sign and return the Supplier Acknowledgment form will not affect the applicability of those documents."  Further, the document also states that "by supplying goods and/or services under an Oneida Limited

purchase order, you agree to be bound by all the terms and conditions of each such document" and a "supplier acknowledgment form confirming the receipt and understanding of the enclosed terms and conditions of purchase . . . ."  (*Id.*).  However, other than the Code of Conduct page, no one from Tablewerks signed the document.

Erwin confirmed that Tablewerks had an exclusivity policy—one product went to one customer—and that Oneida was able to rely on Tablewerks not selling the products it sold to Oneida to Oneida's competitors.  Erwin said that this policy was good for both Oneida and Tablewerks.

In an e-mail that Erwin sent to Oneida, he stated that "Botticelli is, arguably, the strongest shape introduced to the United States food market service in the last decade.  Since its introduction in 2001, we have shipped an annual average of over one million pieces annually to Oneida."

On redirect examination, Erwin testified that Tablewerks never transferred any intellectual property rights to Oneida.  A declaration of Kevin Wellendorf ("Wellendorf"), the Oneida Director of Marketing, was introduced.  (Defs.' Ex. Y).  In this declaration, Wellendorf stated: "In September 2014, I was promoted to Director of Marketing Food Services and in that role I came to understand that there was no contractual relationship between Oneida, on the one hand, and Tablewerks and/or Royal Porcelain on the other."  (*Id.*).

Of importance, the Defendants also introduced into evidence a chart produced by Oneida in 2009.  (Pl.'s Ex. 3).  This intellectual property matrix (the "IP matrix") listed Royal Porcelain or Tablewerks as the owner of each product line and of the design associated with each product line, including Botticelli and Nexus, and all eleven products produced by Royal Porcelain and sold to Tablewerks.

13

### 3. Allan Keck

Allan Keck ("Keck"), the President of R.W. Smith & Co. d/b/a TriMark, R.W. Smith ("R.W. Smith"), also testified by deposition.  R.W. Smith is a wholly owned subsidiary of TriMark USA, LLC ("TriMark"), one of the largest distributors of tabletop products in the United States. R.W. Smith is a dealer in the food services industry and sells products branded by other companies. R.W. Smith is a competitor of Oneida and Steelite and sells products branded by other companies.

Based on his experience over nearly forty years in this business, he is convinced that educated commercial purchasers should associate the products Oneida calls Botticelli and Nexus with the manufacturer Royal Porcelain, not the distributor Oneida.

Keck also testified that when customers complain about a product that is branded by Oneida – for example, a Sant' Andrea product, they register the complaints with R.W. Smith. Occasionally, R.W. Smith sells Botticelli and Nexus and even with regard to these products, the customers refer to R.W. Smith not Oneida.  He also stated that other dealers sell Oneida products like Botticelli and Nexus.  He mentioned the Botticelli product sold by another dealer to Marriott. Also, R.W. Smith is a competitor of both Oneida and Steelite.  In his opinion, the Sant' Andrea back stamp does not make any difference to any customer.

### 4. Paul Kuzina

Paul Kuzina ("Kuzina") is the Vice President of Marketing and Product Management at Steelite.  Formerly, starting in 1991, he was employed by Oneida.  His last position with Oneida was Director of Marketing for the Food Services Division and he had overall management of the seven brands in the Oneida dinnerware category.  He also was involved with "product strategy" in bringing the products to market.  He stated that Botticelli was designed by Queensberry Hunt.

14

While at Oneida, he was involved in developing the trade name Sant' Andrea.  He never saw a contract between Oneida and Tablewerks or Royal Porcelain.  He was not involved in the decision making process involving Botticelli or Nexus.  Since 2014, Kuzina has been the Vice President of Marketing for Steelite.

### 5. David Queensberry

Queensberry testified by deposition and declaration.  He and his partner, Martin Hunt, founded their company Queensberry Hunt in 1956.  They are recognized as experts in the design of tableware.  The company worked for Royal Porcelain.  They designed Botticelli, which Queensberry also said has been highly successful for the last fifteen years.  Although Oneida sold Queensberry Hunt products, Queensberry testified that there has never been any input by Oneida in the Botticelli design, nor has the design concept of Botticelli been influenced in any way by Oneida.  He and Hunt solely did the Botticelli design.  Queensberry and Hunt gave the Botticelli design solely to Tablewerks and  Erwin made the decision to file two design patents on behalf of Tablewerks for this product.  So that Queensberry Hunt assigned their work on Botticelli to Tablewerks.

As to Nexus, in 2006 Queensberry Hunt also designed the Nexus tableware and assigned the product to Royal Porcelain and Tablewerks.  They assigned the copyright for Nexus to Royal Porcelain.  Their reservations was a royalty fee – a tidy fee – now in the sum of approximately forty thousand dollars a year.

Oneida never offered to buy Botticelli, but did approach them to buy Nexus.  However, the rights to both Botticelli and Nexus were assigned to Royal Porcelain and Tablewerks.  As to the sale of Nexus in the United States, Tablewerks paid their royalty fees not Royal Porcelain.  The

same payment arrangements were in place after the sale of Tablewerks to Steelite.  Oneida never

paid a royalty fee to Queensberry Hunt, the designers of its key products.

## C.  Oneida's Rebuttal

### 1.  Corrie Byron

In rebuttal, the plaintiff recalled Corrie Byron, the President of Food Services International

at Oneida.  She described the many tests that were performed by the Oneida quality engineering

team.  Also, she visited the Royal Porcelain factory in Thailand.

## II.  DISCUSSION

## A.  Legal Standard for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Golden*

*Krust Patties, Inc. v. Bullock,* 957 F. Supp. 2d 186, 192 (E.D.N.Y. 2013) (quoting *Winter v.*

*Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249

(2008)).  Whether or not to grant a preliminary injunction is left to the discretion of the district

court.  *See Sagepoint Fin., Inc. v. Small,* 15–cv–571, 2015 WL 2354330, at *6, 2015 U.S. Dist.

LEXIS 64065, at *6 (E.D.N.Y. May 15, 2015) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.,*

409 F.3d 506, 511 (2d Cir. 2005)).

Under the standard for injunctions announced by the Supreme Court in *eBay Inc. v.*

*MercExchange, L.L.C.,* 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), and adopted by

the Second Circuit in *Salinger v. Colting*, 607 F.3d 68, 77–78 (2d Cir. 2010):

> First . . . a court may issue a preliminary injunction . . . only if the plaintiff has
> demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently
> serious questions going to the merits to make them a fair ground for litigation and
> a balance of hardships tipping decidedly in the [plaintiff]'s favor."  Second, the
> court may issue the injunction only if the plaintiff has demonstrated "that he is

16

likely to suffer irreparable injury in the absence of an injunction."  The court must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm (unless such a departure from the long tradition of equity practice was intended by Congress). Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  Third, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor.  Finally, the court must ensure that the "public interest would not be disserved" by the issuance of an injunction.

*Id.* at 79–80 (internal citations omitted).

As to Oneida's burden of establishing irreparable injury in the absence of an injunction, "[s]uch injury must be 'neither remote nor speculative, but actual and imminent and . . . cannot be remedied by an award of monetary damages.'" *Vringo, Inc. v. ZTE Corp.,* 14–cv–4988, 2015 WL 3498634, at *9, 2015 U.S. Dist. LEXIS 71919, at *27–*28 (S.D.N.Y. June 3, 2015) (quoting *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir. 1995)).  "The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *7–Eleven, Inc. v. Khan,* 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013) (Spatt, J.) (quoting *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002)).

## B.   Whether the Plaintiff is Likely to Succeed on the Merits or Whether There Are Sufficiently Serious Questions Going to the Merits

Although Oneida alleged eight causes of action in its complaint, its motion for a preliminary injunction has been constrained to four of those causes of action: the trade dress claims under the Lanham Act and New York State common law; unfair competition; and breach of contract.  Accordingly, the Court will address those claims.

17

Furthermore, although Oneida's claims allege that it has acquired trade dress on all of the designs in the Sant' Andrea line, the arguments have focused completely on the Botticelli and Nexus designs.  The Court will similarly restrict its analysis to those designs.  The Court notes that although Steelite plans to sell the designs under different names, and the Defendants have referred to the designs by different terms, the Court will refer to the designs as Botticelli and Nexus for the sake of simplicity and consistency.

### 1.  As to the Plaintiff's Lanham Act Trade Dress Claim

#### a.  The Applicable Law

Pursuant to section 1125(a) of Title 15 of the United States Code, a cause of action for trade dress infringement may be sustained under the Lanham Act.  Section 43(a) of the Lanham Act provides:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which [ ] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person [ ] shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

The Supreme Court has said that "[t]rade dress is the total image of the business" and "may include the shape and general appearance of the exterior of the restaurant, the identifying sign, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniforms and other features reflecting the total image of the restaurant."  *Two Pesos v. Taco Cabana,* 505 U.S. 763, 764 n.1, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992).  The purpose of trade

dress protection is to "secure to the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Id.* at 774 (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)).

To state a claim for trade dress infringement, a plaintiff must plausibly allege 1) that it owns the trade dress, "[2] that the mark is distinctive as to the source of the good; [3] a likelihood of confusion between its good and the defendant's; and, [4] that the trade dress is not functional." *Vedder Software Grp. Ltd. v. Ins. Servs. Office, Inc.,* 545 F. App'x 30, 33 (2d Cir. 2013) (summary order) (citing *Yurman,* 262 F.3d at 115–16); *see also Sherwood 48 Assocs. v. Sony Corp. of Am.,* 76 F. App'x 389, 391 (2d Cir. 2003) (summary order).

Here, Oneida claims that it owns trade dress in the designs of certain dishes. Courts "exercise particular caution when extending protection to product designs." *Yurman*, 262 F.3d at 114 (internal quotation marks and citation omitted). Indeed, "product design almost invariably serves purposes other than source identification." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000) (noting that "even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing"); *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves. For this reason, courts have exercised particular "caution" when extending protection to product designs.) (internal citations omitted); *Nat'l Lighting Co. v. Bridge Metal Indus., LLC,* 601 F. Supp. 2d 556, 561 (S.D.N.Y. 2009) ("[C]ourts have been reluctant to extend trade dress

protection to a product's design (as opposed to its packaging)"); *Restatement (Third) of Unfair Competition* § 16 cmt.b at 159 (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.").

Because of the concerns about affording trade dress to a product design, a plaintiff claiming trade dress in a product design must prove secondary meaning.  That is, a plaintiff must show that "in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Yurman,* 262 F.3d at 115 (brackets omitted). A plaintiff must also offer "a precise expression of the character and scope of the claimed trade dress." *Landscape Forms,* 113 F.3d at 381.

"Moreover, even a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic'—those that refer to the genus of which the particular product is a species." *Yurman*, 262 F.3d at 115 (internal citations, quotation marks, and alterations omitted). There are two reasons that this check on monopoly rights "is particularly important in cases of product design." *Id.*  "[F]irst, 'overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas.'" *Landscape Forms,* 113 F.3d at 380 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)); *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) ("[T]rade dress claims raise a potent risk that relief will impermissibly afford a level of protection that would hamper efforts to market competitive goods." (internal quotation marks and citation omitted)).

While patents and copyrights afford protections for limited periods of time, trademark rights, including those in trade dress protection, can be forever.  *See Stormy Clime Ltd. v.*

20

*ProGroup, Inc.*, 809 F.2d 971, 977–78 (2d Cir. 1987).  "[S]econd, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Landscape Forms,* 113 F.3d at 380 (quoting *Jeffrey Milstein,* 58 F.3d at 32;) *cf. Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 349–50, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991) (noting that the distinction between ideas and expression in copyright law "assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work").  "Product design is driven primarily by the usefulness or aesthetic appeal of the object; trade dress protection for product design therefore entails a greater risk of impinging on ideas as compared with protection of packaging or labeling." *Yurman*, 262 F.3d at 116.

### b.  Application to the Facts

### i.  Ownership of the Trade Dress

This case presents a unique set of facts.  Oneida, Steelite, and Tablewerks are all distributors.  The manufacturer of the dishes, Royal Porcelain, is not a party to the action.  Oneida claims that it owns trade dress rights, and that those rights are superior to not only to Tablewerks, but also to the manufacturer, Royal Porcelain.  Oneida has never had an agreement with Royal Porcelain.  Oneida claims that it has a contract with Steelite, which is discussed below, but for purposes of this analysis, Oneida has not claimed that it has a contractual relationship which confers ownership of intellectual property rights.

"As a general rule, where a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark," even where the manufacture is located outside the United States. *Tactica Int'l, Inc. v. Atl.*

*Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) (citing *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1220 (9th Cir. 1996); *Aini v. Sun Taiyang Co.*, 964 F. Supp. 762, 774 (S.D.N.Y. 1997), *aff'd sub nom. Topiclear Beauty v. Sun Taiyang Co.*, 159 F.3d 1348 (2d Cir. 1998)).

However, where, as here, the "goods pass through [a distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style" this presumption may be rebutted. *IMAF, S.P.A. v. J.C. Penney Co., Inc.,* 806 F. Supp. 449, 454 (S.D.N.Y. 1992) (internal citations and quotation marks omitted)).  In order to determine whether a distributor can rebut the presumption, a court should consider the following factors:  "(1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints." *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x 31 (2d Cir. 2012) (internal citations and quotations omitted).  "In addition, a court may look at 'which party possesses the goodwill associated with the product, or which party the public believes stands behind the product.'" *Tactica*, 154 F. Supp. 2d at 600 (quoting *Premier Dental Prods. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 854 (3rd Cir. 1986)).

## A.  As to who invented and affixed the trade dress

Oneida claims that it "developed" the Botticelli and Nexus patterns in collaboration with Queensberry Hunt.  Paul Gebhardt testified that Oneida collaborated on the design with Queensbury Hunt.  Some of Oneida's advertising materials stated that the designs were a Oneida-Queensberry Hunt collaboration.  Other advertising material stated that Queensberry Hunt

designed the dishes without making any mention of a collaboration with Oneida.  (Tr. at 286; Pl.'s Exs. 31, 32).

However, David Queensberry, the owner of Queensberry Hunt, testified that "Queensberry Hunt did not collaborate with Paul Gebhardt or anyone else from Oneida on the design of [Botticelli], as confirmed by my review of the Queensberry Hunt Tablewerks files dated 2001-2005.  There is not a single email, drawing[,] or sketch provided to Queensberry Hunt from Oneida concerning the design of [Botticelli].  Oneida simply did not participate in the design concept of [Botticelli]."  (Defs.' Ex. T at ¶ 9).  Queensberry testified that even if Oneida had any input, it came through Erwin who always served as a conduit.  (Tr. at 800–01).  The most favorable testimony from Queensberry was his statement that "I don't have any problem in thinking that it would not be [Erwin] telling Oneida that they must have a 4.5 centimeter thin plate, but the other way around."  (*Id.* at 803).  In the Court's opinion, that was another way for Queensberry to say that he did not have any direct evidence that Oneida collaborated or contributed, but he did not discount the possibility that people at Oneida did so.

Paul Kuzina, who worked at Oneida before transferring to Steelite, stated that he "would have known if Oneida had participated in [the] design" of Botticelli, and to his knowledge, no one had participated in the design of Botticelli.  (Defs.' Ex. X at ¶¶ 5–10).

Oneida provided two sets of emails that show that Oneida was consulted on the IFC shape, which is another dish in the Sant' Andrea line.  (Pl.'s Exs. 107, 110).  While Botticelli is mentioned in Exhibit 107, there is no indication that Oneida was consulted on Botticelli or Nexus.  In fact, Oneida did not produce any documentary evidence that illustrates that Oneida collaborated on the Botticelli or Nexus shapes.

The remaining physical evidence instead confirms that either Tablewerks or Royal Porcelain has the superior claim on IP rights, including trade dress.  In May 2001, Queensberry Hunt assigned all of its IP rights in Botticelli to Tablewerks.  (Defs.' Ex. C).   Tablewerks owns the two patents, and has paid Queensberry Hunt royalties for Botticelli since Queensberry Hunt designed it.  (Defs.' Ex. A, BB).  The patents list Queensberry Hunt as the inventors of the patent; no one from Oneida is listed on the patents.  There is no evidence that Oneida paid any royalties to Queensberry Hunt.  While patents certainly protect rights that are distinct from those secured by trade dress, the patents are instructive because they list the creators as well as the holders of the only registered IP rights.  The Court also notes that in October 2016, Tablewerks applied for copyright protection of the Botticelli design.

 Even Oneida appears to have acknowledged that Tablewerks owned the designs of the dishes.  Four sets of emails are illustrative.

In an email dated June 1, 2009, Lori Rooney from Oneida emailed Erwin to clarify "arrangements" between Royal Porcelain, Tablewerks and Oneida.  (Pl.'s Ex 3).  The IP Matrix was attached to the email.  The IP Matrix listed Tablewerks as owners of the designs of Botticelli, Nexus, and Queensberry.  The other eight designs were owned by Royal Porcelain according to the IP Matrix.  Of importance, Oneida was only credited as having distribution rights.

In October 2011, emails between Queensberry and Oneida's CEO at the time imply that Oneida sought to obtain the IP rights in the Botticelli design.  (Pl.'s Ex. 104).  The email from Queensberry says, in relevant part, "I have had a look at the assignment that we made in May 2001 with [Tablewerks] for the Botticelli shape.  We have given copyright of the shape to [Tablewerks] but it is conditional on the payment of our royalty. . . . Our solution might be to agree that, should

24

Rick default on the payment of our royalty, the design would be assigned to Oneida. You would then have to pay our royalty under the same conditions that we have agreed with [Tablewerks]." (*Id.*). Although the original email was not provided to the Court, it would appear that Oneida was attempting to secure the IP rights to Botticelli.

In June 2015, when Oneida learned that a competitor, Tuxton, was offering a shape that was similar to Botticelli, Oneida emailed Erwin to alert him. (Defs.' Exs. TB–TE). There is no evidence that Oneida contacted Tuxton or believed that Tuxton had infringed Oneida's rights. Oneida contacted Erwin instead, because, in the Court's view, Oneida knew that Erwin and Tablewerks were the holders of any protectable IP rights.

Finally, in January of 2017 Byron emailed the Royal Caribbean Cruise Line to talk about the progress on a "Botticelli-like" product that was being produced by an alternate supplier in China. (Tr. at 180; Pl.'s Ex. 14). While the emails were sent in January 2017, Byron testified that Oneida had begun investigating an alternative Chinese producer in January of 2016. (Tr. at 181). The email chain lists six Botticelli products, and the email implies that the Chinese producer would create similar products. (Pl.'s Ex. 14). As of the date of the hearing, Oneida had received the "Botticelli-like" samples from the Chinese producer, and had given those samples to Royal Caribbean Cruise Line.

This is further bolstered by the statements of Kevin Wellendorf, who worked at Oneida from 2012 through some time after September 2014. Wellendorf testified in an affidavit that he, "along with [his] Oneida colleagues, openly forged relationships with factories other than Royal Porcelain so that Oneida would be able to offer alternate products in the event [Tablewerks]/[Royal

Porcelain] chose not to supply their products by Oneida, including the 'Botticelli' products." (Defs.' Ex. Y at ¶ 5).

Therefore, the Court is doubtful that Oneida will be able to succeed in proving that it invented and affixed the trade dress.

### B.  As to Whose Name Appears With the Alleged Trade Dress of the Dishes' Design

The Sant' Andrea dishes bear the stamps of "Royal Porcelain" and "Sant' Andrea."  (Pl.'s Exs. 69, 72).  Oneida's name does not appear on the Sant' Andrea dishes, (*id.*), nor does it even appear on the Sant' Andrea packaging, (Defs.' Ex. Q).

While Oneida argues that its name is always present in marketing materials, and that customers do not care about whose name is stamped on the plates, both of those points are not persuasive.  Clearly, to determine ownership of the trade dress, the Court must look to whose name appears with the purported trade dress.  *Tecnimed*, 763 F. Supp. 2d at 403; *Tactica*, 154 F. Supp. 2d at 600.  Royal Porcelain's name consistently appears, and Oneida's does not.  However, there was testimony that at least one of the dishes in the Sant' Andrea line is stamped "Royal Bone China" because the material is bone ash, not porcelain.   (Tr. at 608–609; Pl.'s Ex. 78). Nevertheless, Oneida's name does not appear on that dish either.

Therefore, as Oneida's name does not appear on any of the Sant' Andrea dishes, the Court is doubtful that Oneida will succeed in proving this factor.

### C.  As to Which Party Maintains Quality and Uniformity; is Identified With the Product; Answers Complaints; Possesses the Goodwill; and Stands Behind the Product

Although the factors listed in this heading are usually considered separately, in the Court's view, the factors are inextricably intertwined.  Therefore, the Court will consider them together. These factors are also very similar to the secondary meaning analysis, conducted below.

Oneida states that it ensured the quality of the Botticelli and Nexus products.  At best, it seems that Oneida was part of a group that ensured the quality of the products that included Tablewerks and Royal Porcelain.  The two emails, discussed above, indicate that Tablewerks and Royal Porcelain took the lead, with occasional input from Oneida.

Oneida provided a summary of its customer service calls.  (Pl.'s Ex. 111).  In the Court's view, the summary illustrates that Oneida is a distributor.  The summary shows that 95% of the calls did not relate to quality—they related to ordering the plates.

The evidence adduced at the hearing established that in most of its transactions, Oneida sold to dealers who, in turn, sold to the ultimate customers.  So that many of Oneida's "customers" were also dealers.  Ed Dom, Wasserstrom, TriMark United East, TriMark RW Smith are some of the "customers" listed in the summary of customer service calls.  Yet, in the hearing, it was clear that each of these companies are dealers who sell the products to end-users.  Although it was not clear from the evidence what percent of Oneida's business was conducted through distributors, Miles testified that Steelite conducts 80-90% of its business through dealers.  (Tr. at 405–07). Miles also testified that end users call the dealers, and not the distributors, when they have issues. (*Id.*).  The fact that many of the customer service calls came from dealers lends this point some credibility.

If dealers are to be considered customers in this context, the only dealer who testified in the hearing was Keck, the president of RW Smith.  Keck's testimony is instructive on several points.  First, he testified that he believed that the majority of Oneida's business was conducted through dealers.  (*Id.* at 685).  Second, he said that RW Smith offered a warranty on dishes.  (*Id.* at 670–71).  So although it was clear from the evidence that Oneida offered warranties to its customers, at least one dealer also offered warranties.  Third, he testified that commercial purchasers associate Botticelli and Nexus with Royal Porcelain, not Oneida.  (*Id.* at 676).  He said this was especially important during Oneida's bankruptcies because customers felt assured that the product would continue because it was coming from Royal Porcelain, not Oneida.  Finally, he testified that customers of Botticelli and Nexus register complaints with RW Smith.  (*Id.* at 679–81).

Oneida introduced evidence of one customer service visit—to Royal Caribbean Cruise Line.  (Pl.'s Ex. 117).  While Oneida's burden at this juncture is merely to show that there exists at least a sufficiently serious question going to the merits, the Court notes that despite Oneida's claims that its customer service team is consistently dealing with end users and their quality complaints, only one example of a customer visit was introduced.

Oneida's shortcomings on this issue are further magnified by the fact that there was testimony that many of the "end users" that purchased Sant' Andrea products had visited the Royal Porcelain factory.  Marriot, Royal Caribbean Cruise Line, Carnival Cruise Lines, KLM Airlines, and Northwest Airlines all made multiple trips to the Royal Porcelain factory in Thailand.  (Tr. at 534).  Erwin testified that most, though not all, of the major customers for Royal Porcelain

28

products, which included the Sant' Andrea line, had visited the Royal Porcelain factory. (*Id.* at 535).

While Oneida introduced several quality tests related to the dishes (Pl.'s Exs. 122–25), Oneida did not connect them in any way to the production of the dishes. It is unclear to the Court what the purpose of Oneida's testing is, but there was no evidence that**,** after testing, Oneida communicated with Royal Porcelain or Tablewerks to augment the dishes in any way. So although it is clear that Oneida tests the quality of the dishes, Oneida has not made a sufficient showing at this juncture to claim that it in any manner maintains the quality of those dishes.

Oneida has argued throughout these proceedings that customers associate Botticelli, Nexus, and the other Sant' Andrea dishes with Oneida. Yet it offered no such proof from any customers. This may be the fact that is most fatal to Oneida's instant application—because this speaks not only to ability to prove ownership, but also to whether secondary meaning has attached. The only evidence that a "customer" associates the dishes with Oneida is Hoffman's declaration, in which he said that the dishes were "synonymous" with Oneida. As the R&R correctly pointed out, this would provide support for a showing of secondary meaning. However, during his deposition he amended his declaration to say that the dishes were merely "marketed" by Oneida. Steelite also argued that Hoffman testified in his deposition that he was not authorized to speak on behalf of Marriot, but if Hoffman so testified it was not read into the record. Nevertheless, Oneida does not argue that either Hoffman or Marriot believe that the Botticelli design is synonymous with Oneida.

Hoffman's declaration was Oneida's only evidence of secondary meaning, and the changes made by Hoffman in his deposition virtually destroyed that evidence. Although Oneida's

29

employees testified that customers associate the dishes with Oneida, the Court places little weight on that testimony.  This is insufficient to show that customers identify Oneida with the product.

Therefore, the Court finds that Oneida has not met its burden in showing that there exists a sufficiently serious question as to the merits of its claim that it owns the Botticelli and Nexus trade dress.

### ii.  As to Infringement of Trade Dress

While the Court does not believe that Oneida has met its burden in showing that there are sufficiently serious questions regarding whether Oneida owns the trade dress in the dishes at issue, the Court will nevertheless address the merits of whether Steelite and Tablewerks infringed on that trade dress.  For similar reasons to those announced above, the Court finds that Oneida has not shown that sufficiently serious questions exist as to whether Steelite or Tablewerks infringed Oneida's claimed trade dress.

### A.  Whether It Is Non-Functional

The Defendants do not appear to dispute that the dishes are non-functional.  Indeed, the Second Circuit has said that "hotel china is not functional as a matter of law . . . ."  *Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc.*, 999 F.2d 619, 622 (2d Cir. 1993).  This Court will adhere to the Second Circuit precedent, and holds the same.

### B.  As to Whether it has attained secondary meaning

'To determine whether secondary meaning has attached, the court considers six factors: '(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use.'"  *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 618

30

(2d Cir. 2008) (summary order) (quoting *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063, 1070 (2d Cir. 1995) (further citations omitted)).

It is clear that Oneida has shown great sales success, and that it has spent a great deal advertising the Botticelli and Nexus products.  Oneida also introduced evidence of two instances of unsolicited media coverage.

However, as discussed above, Oneida has not shown that *any* consumers link the trade dresses to Oneida.  As the Court stated above, this may be the fact most fatal to its current application.  *See Mana Prods.,* 65 F.3d at 1071 (2d Cir. 1995) (affirming the district court's finding that the plaintiff had failed to raise a material issue of fact as to secondary meaning by submitting one customer affidavit and claiming that it had spent over $3 million in advertising); *Braun Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 826–27 (Fed. Cir. 1992) (applying the same factors as the Second Circuit, the Court held that the jury's finding of secondary meaning was unsupported because of the plaintiff's "limited evidence as to advertising, sales and media attention, standing alone, [wa]s not sufficient to demonstrate that the consuming public identified the [product] design with its maker, [the plaintiff]"); *Ward v. Barnes & Noble, Inc.*, 93 F. Supp. 3d 193, 206–07 (S.D.N.Y. 2015) (granting summary judgment against a plaintiff where the plaintiff did not introduce any evidence that customers associated the product design with the plaintiff), *reconsideration denied*, No. 13-CV-7851 JMF, 2015 WL 1442449 (S.D.N.Y. Mar. 30, 2015); *see also First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir. 1987) ("A large expenditure of money does not in itself create legally protectable rights. The test of secondary meaning is the effectiveness of the efforts to create it.") (internal alterations, citations and quotation

marks omitted); *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir. 1979) (mere presence of extensive advertising does not resolve issue of secondary meaning).

As the First Circuit has further articulated:

> Proof of secondary meaning requires at least *some* evidence that consumers associate the trade dress with the source. Although evidence of the pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, *it cannot stand alone.* To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product.

*Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,* 259 F.3d 25, 44 (1st Cir. 2001) (first emphasis in the original; second emphasis added) (considering similar factors as the Second Circuit).

The Plaintiff's position is further weakened when the Court considers exclusivity and attempts to plagiarize.  First, there are several other companies that have dishes that are very similar to the Botticelli.  That means that Botticelli's design is not exclusive to Oneida.  Second, Oneida never sought to claim trade dress protections against those competitors before this action.  Oneida's "failure to police its [alleged] trade dress for [more than a decade] is further evidence that the [] [] trade dress is weak and has not acquired distinctiveness."  *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 364–65 (S.D.N.Y. 2003) (citing *BellSouth Corp. v. DataNational Corp.,* 60 F.3d 1565, 1569–70 (Fed. Cir. 1995); *Brandwynne v. Combe Int'l., Ltd.,* 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999)).

Vertex's dish that is similar to Botticelli, which is known as Crystal Bay, has been in the market for years, possibly longer than Botticelli.  There was evidence that several other dishes were also extremely similar to Botticelli, such as Tuxton's Pacifica and Get Minsky.  One dealer's

catalogue advertised both Botticelli and Pacifica. (Defs.' Ex Z ¶ 10; Defs.' Ex. P).  As discussed above, when Oneida learned that Tuxton had introduced a dish that was similar to Botticelli, instead of attempting to protect what it now claims is its trade dress, Oneida emailed Erwin of Tablewerks.  There was no evidence that any party took any action against Tuxton.  "A product design trade dress may become generic . . . 'as a result of the trademark owner's failure to police it, so that widespread usage by competitors leads to generic usage among the relevant public, who see many sellers using the same product design.'" *Malaco Leaf*, 287 F. Supp. 2d at 364–65 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* §§ 12:1, 17:8, 17:17 (4th ed. 2003)).

If the design is generic, even a showing of secondary meaning would be insufficient to afford it the protections of trade dress.  See *Yurman,* 262 F.3d at 115 ("[E]ven a showing of secondary meaning is insufficient to protect product designs that are overbroad or generic.");  *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) ("A trade dress that consists of the shape of a product that conforms to a well-established industry custom is generic and hence unprotected."); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 638 (6th Cir. 2002) (finding generic product configurations unprotectable despite secondary meaning evidence because "no designer should have a monopoly on designs regarded by the public as the basic form of a particular item"); *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.,* 205 F.3d 137, 142 (4th Cir. 2000) ("Trade dress should be considered generic if well-known or common ... or a common basic shape or design"); *Malaco Leaf,* 287 F. Supp. 2d at 364 ("It is axiomatic that generic product designs are not entitled to trade dress protection under the Lanham Act . . . .").

Therefore, the Court finds that Oneida has not met its burden in showing that there exists at least a sufficiently serious question as to whether Botticelli or Nexus have acquired secondary meaning.

### C. As to the Likelihood of Confusion

While the Court need not address the likelihood of confusion because it finds that Oneida has not met its burden in showing that sufficiently serious questions exist as to whether it owns purported trade dress, or that it has acquired secondary meaning, s*ee Samara Bros.,* 529 U.S. at 210 ("[W]ithout distinctiveness the trade dress would not cause confusion[.]") (quotations omitted); *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 21819 (2d Cir. 1985) ("Only if the district court rules that [the trademark] has acquired secondary meaning must it comprehensively examine the *Polaroid* factors to determine whether there exists a likelihood of confusion as to source."), the Court will review this factor because it is an element in the New York trade dress claim.

In determining whether there is a likelihood of consumer confusion, courts in this circuit consider Judge Friendly's well accepted *Polaroid* factors:

> The strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in  adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Thompson Medical,* 753 F.2d at 213 (quoting *Polaroid Corp. v. Polarad Elects. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961) (internal alterations omitted)).  As mentioned above, the Court finds that Oneida is not likely to succeed in proving that the claimed trade dress is strong because Oneida's competitors have dishes that are highly similar, and neither Oneida nor any other party sought to

exclude competitors from selling those dishes.  Oneida is even seeking to make a dish that is "Botticelli-like."

The remaining factors illustrate what a unique situation this is.  Plaintiffs typically claim trade dress to prevent a competitor from selling a product that is so similar that it would lead to confusion as to who made the product.  Here, Oneida asks the Court to stop Steelite from selling the exact products that Oneida has sold for years.  Oneida goes even further and asked that the Court stop Royal Porcelain from producing the products that Royal Porcelain has made and sold to Oneida for distribution for years.  The only confusion has come from Oneida's customers—as to whether Oneida will be able to continue to sell Botticelli and Nexus or whether the consumers will have to buy those dishes from Steelite.

There is no need to gauge the similarity or proximity—the products will be the same, and will be sold in the same market, but will be sold under a different name.  This is not an instance where a competitor has copied Botticelli and is trying to pass it off as something sold by Oneida.  Steelite will be selling Botticelli dishes, not imitations or copies.  However, contrary to Oneida's contention, this does not translate to a presumption of confusion.  The cases to which Oneida cites concern instances where competitors copied the plaintiff's product.  *See, e.g., Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 496–97 (S.D.N.Y. 2015) (defendant was a "habitual infringer" that copied famous brands' trademarks); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 232 (S.D.N.Y. 2004) (defendants designed and offered watches that were extremely similar to Cartier's watches); *Dunkin' Donuts Inc. v. N. Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 43 (E.D.N.Y. 2001) (defendants were using Dunkin' Donuts' trademarks in order to hold themselves out to be Dunkin' Donuts franchisees, despite the

fact that their franchise had been terminated); *PAF S.r.l. v. Lisa Lighting Co.*, 712 F. Supp. 394, 396 (S.D.N.Y. 1989) (defendants sold a "knockoff" lamp). Unlike those cases, Steelite seeks to sell the same products that Oneida previously sold. As stated above, the Court finds that Oneida has not established a sufficiently serious question as to whether it has any right to continue to sell the products.

Furthermore, Steelite will place its own name next to Royal Porcelain's name on both the dishes as well as the packaging. This significantly reduces any possibility of confusion. *See Landscape Forms*, 113 F.3d at 382–83 ("Columbia and Landscape are clearly identified as the manufacturers of their respective lines of furniture in industry catalogs, and their products bear labels identifying their maker. These marketplace realities make confusion improbable, even though the two product lines compete in the same market."). As discussed above, there was undisputed evidence that consumers knew that the dishes originated from Royal Porcelain and associated the dishes with that company and/or factory.

Finally, it is clear that the consumers of Botticelli and Nexus are highly sophisticated. Whether the consumers being considered are dealers or end users, these are consumers that buy in bulk and have relationships with companies at several points in the distribution chain. The consumers will know from where the products came. *See id.* at 382–83 (stating that there was no likelihood of confusion where the general public was unaware of the plaintiff's "dress," and the consumers were sophisticated design professionals); *Gerffert Co. v. Dean*, 41 F. Supp. 3d 201, 218 n.36 (E.D.N.Y. 2014) (stating that although the court would not explicitly consider the *Polaroid* factors because the plaintiff had not proved secondary meaning, the plaintiff would also fail in proving secondary meaning because "potential customers in the market for [the] products were

sophisticated institutions, not individuals; and [] there was no 'actual confusion' between both sources of [the] products, because potential customers were notified that [the new distributor] was a new company, not to be confused with [the plaintiff]"). "When evaluating these claims, courts must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." *Landscape Forms*, 113 F.3d at 375. The Court does not believe there is any risk of deceptive representation here.

Therefore, the Court finds that Oneida has not met its burden in demonstrating that sufficiently serious questions exist concerning the likelihood of confusion, or concerning Oneida's trade dress infringement claim.

## 2. As to the Plaintiff's New York Trade Dress Claim

The elements of a trade Dress infringement claim made under New York law are the same as those for a claim made under the Lanham Act, except that the plaintiff does not need to prove secondary meaning. *Neutrik AG v. Switchcraft, Inc.*, No. 99 CIV. 11931 (JSM), 2001 WL 286722, at *1 n.2 (S.D.N.Y. Mar. 23, 2001) ("In general, [the plaintiff]'s state law claims for [] [] trade dress infringement involve an analysis similar to that under the Lanham Act. [However,] a state claim for trade dress infringement does not require proof of secondary meaning . . . .") (citing *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 11 (2d Cir. 1987) (additional citations omitted)) *aff'd*, 31 F. App'x 718 (Fed. Cir. 2002).

Therefore, for the same reasons set forth above, the Court finds that Oneida has not met its burden on its New York trade dress infringement claim because it has not demonstrated sufficiently serious questions going to whether Oneida owns the trade dress, or whether there is any likelihood of confusion.

### 3.  As to the Plaintiff's Unfair Competition Claim

"[T]he essence of unfair competition under New York common law is the 'bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc.,* 728 F. Supp. 236, 249–50 (S.D.N.Y. 1990) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F. Supp. 424, 429 (S.D.N.Y. 1987), *aff'd*, 923 F.2d 845 (2d Cir. 1990)); *see also Sly Magazine, LLC v. Weider Publications L.L.C.*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order) ("To prevail on a New York unfair competition claim, a plaintiff must show either actual confusion or a likelihood of confusion, and there must be "some showing of bad faith" on the part of the defendants.") (citing *Jeffrey Milstein,* 58 F.3d at 34-35).

However, "[n]ot every act, even if taken in bad faith, constitutes unfair competition." *Computer Associates, Inc. v. Simple.com, Inc.,* 621 F. Supp. 2d 45, 53 (E.D.N.Y. 2009) (holding that a plaintiff must show more than commercial unfairness).  "The tort is not all-encompassing . . . ; the New York Court of Appeals in rejecting the notion that unfair competition is equivalent to the amorphous term commercial unfairness has stated that misappropriation of another's commercial advantage is a cornerstone of the tort." *Id.* (quoting *Laser Diode Array, Inc. v. Paradigm Lasers, Inc.,* 964 F. Supp. 90, 95 (W.D.N.Y. 1997) (quoting *Ruder & Finn Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 668, 439 N.Y.S.2d 858, 422 N.E.2d 518 (N.Y. 1981))). Notably, to act in "bad faith," one must exploit some "commercial advantage which belonged exclusively to [another]." *LoPresti v. Mass. Mut. Life Ins. Co.,* 30 A.D.3d 474, 820 N.Y.S.2d 275, 277 (2d Dep't 2006).

Oneida's alleges that the Defendants have committed unfair competition by misappropriating the goodwill that Oneida has built up surrounding the Sant' Andrea brand, as well as the tooling that Oneida owns in the Royal Porcelain factory.

As discussed above, the Court does not find that a sufficiently serious question exists regarding whether there is a likelihood of confusion.  Furthermore, Oneida has not met its burden as to the other elements.

Namely, the Court finds that Oneida has not made a sufficient showing as to the Defendants bad faith.  Steelite purchased Tablewerks so that Steelite could reap the benefits of Royal Porcelain, its factory, and the designs owned by Tablewerks or Royal Porcelain.  Although that may be commercially unfair to Oneida, the Court does not believe there is a sufficient showing of bad faith.

Therefore, the Court finds that Oneida has not met its burden in demonstrating that a sufficiently serious question exists regarding the merits of its unfair competition claim.

### 4.  As to the Plaintiff's Breach of Contract Claim

Under New York law, there are four elements in a breach of contract claim: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996).  "Under New York law, in the absence of fraud or other wrongful conduct, a party who signs a written contract is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions."  *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (*Level Export Corp. v. Wolz, Aiken & Co.,* 305 N.Y. 82, 87, 111 N.E.2d 218 (N.Y. 1953)).

Tablewerks contends that it never entered into a contract with Oneida.  Oneida's sole evidence of a written contract is Erwin's signature on a page titled "Code of Conduct," which is the 4th page of the purported contract, which consists of 15 pages.  Notably, the signature page, page 14, is not signed.  Oneida argues that Erwin's signature on page 4 bound him to the entire contract, or in the alternative, Erwin did not need to sign the contract in order to be bound.

While a party is bound to a contract that they accept or sign, Oneida has not made a sufficient showing that Tablewerks did either.  As discussed below, mere oral acceptance of Oneida's contract is insufficient to establish validity for a contract such as this one.  As to the sufficiency of Erwin's signature on a page titled "Code of Conduct," the Court does not accept Oneida's theory that it will be able to prove that signature evidences Tablewerks' intent to be bound to the entire contract.

Although Oneida argues that Tablewerks did not have to sign the contract to be bound by it, under New York law, the Statute of Frauds generally requires that a contract be evidenced by a writing signed by the party against whom enforcement is sought.  N.Y. GEN. OBLIG. LAW § 5–701(a); N.Y. U.C.C. § 2–201(1).  Specifically, the Statute of Frauds "requires a written contract for an agreement that is not to be performed within one year of its making." *Sheehy v. Clifford Chance Rogers & Wells LLP,* 3 N.Y.3d 554, 560, 822 N.E.2d 763, 766, 789 N.Y.S.2d 456, 459 (N.Y. 2004) (citing N.Y. GEN. OBLIG. LAW § 5–701(a)).

Here, Oneida implicitly contends that this was an indefinite contract, which is not capable of being performed in one year.  Therefore, since there is no writing signed by Erwin, or by anyone on behalf of Tablewerks, it is unenforceable.  *See United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 404 (S.D.N.Y. 2001) ("*Unimag I*") ("Since no express

term was ever alleged, the contracts are for an indefinite duration and so not capable of performance within one year. The alleged contracts are thus barred by § 5–701."), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) (summary order).

> Said differently,
>
> There is no evidence that the parties agreed to (or even discussed) an end date for [] performance, and plaintiffs do not assert that such an end date existed. Hence, either the contract was terminable at will by either party—in which case there was no "unambiguous promise" that [the defendant] would continue to supply videos indefinitely, granting [the defendant] a contractual right to terminate supply at any time and vitiating any promissory estoppel claim—or, on the other hand, the contract was one of indefinite duration, in which case the Statute of Frauds applies.

*Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 427 (E.D.N.Y. 2013) (citing *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 457, 472 N.E.2d 992, 995, 483 N.Y.S.2d 164, 167 (N.Y. 1984) ("[T]he oral agreement between the parties called for performance of an indefinite duration . . . . As such, the agreement fell within the Statute of Frauds and was void."); *Rosen v. Hyundai Group (Korea),* 829 F. Supp. 41, 48–49 (E.D.N.Y. 1993) (finding that the Statute of Frauds applied to oral supply contract of indefinite duration)).

Oneida argues that Tablewerks' past performance of the contract renders it enforceable, citing N.Y. U.C.C. §§ 2-201 and 2-207.  However, case law is clear that distributorship agreements of indefinite duration are governed not by the Statute of Frauds provision in the New York Uniform Commercial Code, but by the New York General Obligations Law.  *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 427–32 (E.D.N.Y. 2013) (analyzing promissory estoppel claim for alleged exclusive distribution agreement under N.Y. GEN. OBLIG. LAW § 5-701); *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, No. 07CV4175NGGRLM, 2008 WL 4693246, at *6 (E.D.N.Y. Oct. 17, 2008) (analyzing an alleged breach of exclusive distribution rights and stating that "[t]he

breach of contract claim is not governed by the Uniform Commercial Code, as the breach does not relate to the individual sale of goods between [the defendant] and the plaintiff, but rather the parties' 'distribution relationship'") (internal citations omitted); *Milton Abeles, Inc. v. Farmers Pride, Inc.*, No. 03-CV-6111 DLI WDW, 2007 WL 2028069, at *11 (E.D.N.Y. July 11, 2007) ("[The Plaintiff]'s breach of contract cause of action is based upon the distribution relationship of the parties, not an individual sale of goods. As such, GOL § 5-701 is the applicable Statute of Frauds provision.") (internal citations omitted); *Clarence Beverage, Inc. v. BRL Hardy (USA), Inc.*, No. 99-CV-0256E(M), 2000 WL 210205, at *2 (W.D.N.Y. Feb. 8, 2000) (collecting cases) (citing *D & N Boeing, Inc.,* 63 N.Y.2d 449 (finding that the Statute of Frauds provision of N.Y. GEN. OBLIG. LAW § 5-701 barred an oral distribution agreement); *see also Adiel v. Coca–Cola Bottling* [sic] *Co.,* 95 CIV. 0725 (WK), 1995 WL 324770, at *1 (S.D.N.Y. 1995) (applying 5-701 to an oral distributorship); *Paper Corp. v. Schoeller Technical Papers, Inc.,* 773 F. Supp. 632, 636 (S.D.N.Y. 1991) (holding that under New York law, specialized Statute of Frauds prevails over general ones, and therefore applying the N.Y. GEN. OBLIG. LAW Statute of Frauds instead of the N.Y. U.C.C.); *North Shore Bottling Co., Inc. v. C. Schmidt and Sons, Inc.,* 22 N.Y.2d 171, 175 (N.Y. 1968) (applying N.Y. GEN. OBLIG. LAW § 5–701 to oral agreement promising exclusive distributorship); *Zimmer–Masiello, Inc. v. Zimmer, Inc.,* 552 N.Y.S.2d 935, 938–939 (N.Y. App. Div. 1990) (same).

And while the New York U.C.C. allows for contracts to be taken out of the Statute of Frauds for partial performance, "[i]t is well settled that part performance by one party does not take a contract that cannot be performed within one year of its making out of the statute of frauds [of the N.Y. GEN. OBLIG. LAW] —unless the contract is one relating to a transaction in real estate,

which is not the case here." *Gentile v. Conley*, 636 F. Supp. 2d 246, 255–56 (S.D.N.Y. 2009) (citing 61 N.Y. Jur.2d, *Frauds, Statute of,* § 300 ("The general rule [is] that the mere part performance of an oral contract not to be performed within a year does not take the contract out of the operation of the statute of frauds in actions at law . . . .")); *Human Techs. Corp. v. Tennessee Alabama Mfg., Inc.*, 147 A.D.3d 1347, 46 N.Y.S.3d 745, 746 (N.Y. App. Div. 2017) ("[P]art performance is not applicable to actions governed by section 5–701." (citing *American Tower Asset Sub, LLC v. Buffalo–Lake Erie Wireless Sys. Co., LLC,* 104 A.D.3d 1212, 1212, 961 N.Y.S.2d 667 (N.Y. App. Div. 2013); *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC,* 93 N.Y.2d 229, 235, 711 N.E.2d 953, 956 (N.Y. App. Div. 1999)).

Therefore, partial performance by Tablewerks would not remove the purported contract from the Statute of Frauds under the N.Y. GEN. OBLIG. LAW.

Nevertheless, even if the Court were to analyze Tablewerks' alleged partial performance under the N.Y. U.C.C., the Court does not believe that Oneida would meet its burden.  In order to overcome the Statute of Frauds, partial performance must be "unequivocally referable to the agreement."  *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 CIV. 4635 (RPP), 2006 WL 2683429, at *6 (S.D.N.Y. Sept. 18, 2006) (citing *Blue Ridge Invs., LLC v. Anderson-Tully Co.*, 2005 WL 44382, at *4 (S.D.N.Y. Jan. 10, 2005) (further internal citations omitted)).  Here, the parties agree that Tablewerks had an exclusivity policy—each of its products had one distributor.  This was not an exclusivity agreement so much as an exclusivity policy by Tablewerks.  Therefore, Tablewerks' behavior can be reasonably explained by reasons other than a purported agreement. *See Shaftel v. Dadras,* 39 F. Supp. 2d 217, 230 (E.D.N.Y. 1999) (noting that the requirement that conduct be explainable only with reference to the agreement is strict and "if the performance is

'reasonably explained' by the possibility of other reasons for the conduct, the performance is equivocal and the Statue of Frauds bars enforcement").

Accordingly, the Court finds that Oneida has not demonstrated that a sufficiently serious question exists as to whether Tablewerks breached a written contract.

### a. As to Whether Oneida Can Rely on an Implied Contract or Promissory Estoppel

In the alternative, Oneida asks the Court to find that serious questions exist as to whether an implied contract existed, or whether Oneida should be granted relief based upon the theory of promissory estoppel. The Court finds that Oneida would be unable to meet its burden under either theory of recovery at this stage.

First, as stated above, the Court cannot find an implied contract existed because it would violate the Statute of Frauds.

Second, Oneida's complaint clearly states that its breach of contract claim is based upon the signed "Vendor Agreement." The complaint does not allege that the parties entered into an oral implied contract, or that Oneida is entitled to relief based upon a theory of promissory estoppel. The latter two theories are grounded in equitable principles, while the first is not. Promissory estoppel has requirements that are separate and distinct from those of a breach of contract claim. *See, e.g., Randolph Equities, LLC v. Carbon Capital, Inc.,* 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009) ("Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract."); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 74 (E.D.N.Y. 2006) ("The Second Circuit has recognized that 'implied contract and promissory estoppel have distinct requirements,' so that 'a claim for breach of implied contract is

44

distinct from a promissory estoppel claim.'" (quoting *Cweklinsky v. Mobil Chemical Co.*, 364 F.3d 68, 77–78 (2d Cir. 2004))

Even if the Court were to entertain Oneida's promissory estoppel claim, the Court concludes that Oneida is unlikely to prevail on such a claim.  "[A] claim for promissory estoppel may not be maintained under New York law where the alternative claim for breach of contract is barred by the Statute of Frauds, unless the circumstances make it unconscionable to deny the promise upon which the plaintiff relied."  *United Magazine*, 279 F. App'x at 18 (internal citations omitted).  Unless Oneida can show that the circumstances make it unconscionable for the Court to deny its promissory estoppel claim, the Statute of Frauds also prevents the Court from granting it relief under a theory of promissory estoppel.

An "unconscionable injury" is one "beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement."  *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994).

In the Court's view, Oneida has not shown that sufficiently serious questions exist as to whether there was an unconscionable injury.  Oneida was notified that Tablewerks had been sold, and that Steelite would complete purchase orders for a given period of time while Oneida regrouped.  *See, e.g., United Magazine*, 279 F. App'x at 18 ("The district court determined that the loss of money invested in the business over the years is precisely the injury that flows naturally from the non-performance of an oral agreement to grant an exclusive wholesale territory until notice of termination is given and correctly held that this conduct does not constitute an "unconscionable" injury.") (internal citations and quotations omitted); *Rosen*, 829 F. Supp. at 49 ("Under settled principles of New York law, there is no unconscionability in invoking the Statute

45

of Frauds in a situation where a distributor who has been terminated already has received substantial benefits from the distributorship."); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 99 A.D.2d 522, 471 N.Y.S.2d 299 (N.Y. App. Div.) (holding that the plaintiff could not show an unconscionable injury where a distributor terminated the sub-distributorship twenty-seven years after it began and stating it was "not a case where a promisee was induced to act upon an unfulfilled promise. It is clear that both sides to the agreement herein continued to perform and derive benefits for almost three decades before the agreement was terminated"), *aff'd*, 63 N.Y.2d 449, 472 N.E.2d 992, 483 N.Y.S.2d 164 (N.Y. 1984).

Therefore, the Court finds that Oneida has not made a sufficient showing at this juncture as to its breach of contract claim.

### III.  CONCLUSION

While the Court grants that Oneida may suffer irreparable harm in the form of loss of good will and client relationships that it has built up through its sales of the Sant' Andrea brand over the years, the Court cannot grant Oneida's motion.  The Court clearly finds that Oneida has not met its burden in showing that there is at least a sufficiently serious question regarding the merits of its claims.  *See Salinger v. Colting*, 607 at 77–78 (stating that a preliminary injunction can only be granted if the plaintiff first demonstrates either "a likelihood of success on the merits or [] sufficiently serious questions going to the merits").  Instead, the Court is of the view that Oneida may not be able to succeed on any of its claims.

Accordingly, the Court vacates the temporary restraining order, initially issued on February 28, 2017, and denies Oneida's motion for a preliminary injunction.  While Oneida's initial motion asked for expedited discovery, the issue was not briefed by either party in its post-hearing

submissions.   Nevertheless, Courts routinely grant motions for expedited discovery upon a showing of reasonableness and good cause.  *See, e.g., Pearson Educ., Inc. v. Doe*, No. 12 CIV. 4786 BSJ KNF, 2012 WL 4832816, at *3 (S.D.N.Y. Oct. 1, 2012) (stating that courts have applied "the flexible standard of reasonableness and good cause" when deciding motions for expedited discovery) (collecting cases);  *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (same).

Although other courts have applied a four-part test derived from *Notaro v. Koch,* 95 F.R.D. 403, 405 (S.D.N.Y. 1982), the Court believes that the more flexible approach is proper.  "As the Rules permit the Court to act by order, but do not elaborate on the basis for taking action, it seems that the intention of the rule-maker was to confide the matter to the Court's discretion, rather than to impose a specific and rather stringent test."  *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326 (S.D.N.Y. 2005).  As there has already been a great deal of discovery conducted in this case, the Court finds that Oneida's request is reasonable.  Furthermore, as Oneida has shown that it may suffer irreparable harm, the Court finds that it has also demonstrated good cause.  Accordingly, Oneida's motion for expedited discovery is granted.

This case is respectfully referred to Magistrate Judge Tomlinson for the remainder of discovery.

It is **SO ORDERED:**

Dated: Central Islip, New York

May 10, 2017

__/s/ Arthur D. Spatt__

ARTHUR D. SPATT

United States District Judge
